# ROGER L. SAUNDERS *v.* CLARK BRINER ET AL.
## (SC 19940)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiff sought to recover damages from the defendants, B and two
limited liability companies solely owned by B, C Co. and T Co., for
their mismanagement in connection with certain business transactions,
alleging, inter alia, breach of contract, fiduciary duty, and the implied
covenant of good faith and fair dealing, and violations of the Connecticut
Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.) and the Connecti-
cut Limited Liability Company Act (CLLCA) ([Rev. to 2017] § 34-100 et
seq.). The plaintiff also sought the judicial dissolution of R Co. and F
Co. R Co. was a limited liability company owned equally by T Co. and
S, the plaintiff's son, and had been formed for the purpose of conducting
a commercial real estate lending business. S later transferred his 50
percent interest in R Co. to the plaintiff. F Co., a limited liability company
owned by the plaintiff and B, was created to act as the controlling
general partner of a related fund, which provided a vehicle for pooling

---

* This case originally was scheduled to be argued before a panel of this
court consisting of Chief Justice Robinson and Justices Palmer, McDonald,
D'Auria, Mullins, Kahn and Ecker. Although Justice Palmer was not present
when the case was argued before the court, he has read the briefs and
appendices, and listened to a recording of the oral argument prior to partici-
pating in this decision.

Saunders *v.* Briner

outsider investor capital for R Co.'s loans. The plaintiff agreed to source loans, secure investors and financers, and provide bridge financing, and, in return, the plaintiff would receive certain profits and fees from the loan transactions. When the plaintiff and S rejected B's request for a larger share of the profits, B created C Co. in order to divert outsider capital away from R Co., negatively affecting R Co.'s profits. B also allegedly misallocated investor profits, improperly increased investments by his insider investors and improperly charged R Co. for expenses incurred by T Co. After the plaintiff initiated the present action, the parties agreed to hire a joint, court-appointed fiduciary, A Co., to wind up the fund and F Co. A Co. issued a report detailing the lack of internal controls and concluded that R Co., the fund, and F Co. had underpaid the investors and principals, particularly the plaintiff. At trial, the court allowed W, a partner of A Co., to testify about his findings and admitted A Co.'s report into evidence. Following a bench trial, the court rendered judgment for the plaintiff on four of his derivative counts alleging, on behalf of R Co., breach of contract against T Co., and violations of CUTPA against all of the defendants, and, on behalf of R Co. and F Co., breach of fiduciary duty against T Co. The trial court rendered judgment for the plaintiff on four of his direct counts alleging breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty by T Co. and B for their failure to repay a portion of a loan funded by the plaintiff's single-member limited liability company, S Co. The trial court found against the plaintiff on his claim that B should be required to reimburse the plaintiff for fees relating to tax and accounting services provided by A Co. but awarded the plaintiff attorney's fees in connection with his derivative CUTPA claim. On appeal, the defendants claimed that the trial court lacked subject matter jurisdiction to review the plaintiff's derivative claims because CLLCA did not provide a derivative remedy, and, in the absence of a statutory remedy, the common law did not afford a member or manager of a limited liability company derivative standing because CLLCA, the statutory scheme that created the limited liability company structure, exclusively governs such claims. The defendants also claimed that the trial court incorrectly rendered judgment for the plaintiff on his direct claims concerning the failure of B and T Co. to repay one of the plaintiff's loans to R Co. because the plaintiff lacked standing to seek repayment on the ground that S Co. provided the investment and was the proper party to have asserted that claim. The defendants further claimed on appeal that the trial court had abused its discretion in admitting W's testimony relating to certain of the plaintiff's derivative claims and that the trial court improperly awarded attorney's fees associated with both the plaintiff's CUTPA and non-CUTPA claims rather than those fees attributable to only the CUTPA claims. The plaintiff cross appealed, claiming that the court had abused its discretion in declining to order B to reimburse R Co. for the fees incurred for work performed by W and another accountant retained by the plaintiff or to hold a hearing for the purpose of apportioning those fees. *Held*:

334 Conn. 135     DECEMBER, 2019     137

Saunders *v.* Briner

1. This court concluded that, in the absence of a provision in the operating agreements of R Co. and F Co. authorizing the filing of a derivative action, the plaintiff lacked standing to bring his derivative claims on behalf of those companies because neither CLLCA nor the common law provided for a derivative remedy when the plaintiff commenced the present action, and, accordingly, the trial court improperly exercised subject matter jurisdiction over the plaintiff's derivative claims: CLLCA ([Rev. to 2017] § 34-187) authorized only members or managers to collectively commence an action in the name of the limited liability company upon a requisite vote of disinterested members or managers, the common law of this state does not recognize limited liability companies, which were created by the enactment of CLLCA, and recognition of a common-law remedy would conflict with or frustrate the purpose of CLLCA; moreover, because the plaintiff lacked standing to assert its derivative CUTPA claim, the trial court's order awarding the plaintiff attorney's fees and costs under CUTPA was vacated, and this court did not need to address the issues of whether the trial court properly admitted W's testimony and whether the trial court incorrectly apportioned the plaintiff's award of attorney's fees between his CUTPA and non-CUTPA claims.

2. The plaintiff had standing to bring direct claims with respect to the failure of B and T Co. to repay a portion of S Co.'s loan to R Co., and, accordingly, the trial court properly exercised subject matter jurisdiction over the plaintiff's direct claims: this court concluded that, when the member of a single-member limited liability company seeks to remedy a harm suffered by the company, the trial court may, in its discretion, permit the member to bring an action raising derivative claims as a direct action and may order an individual recovery if it finds that to do so will not unfairly expose the company or defendants to a multiplicity of actions, will not materially prejudice the interests of creditors of the company, and will not negatively impact other owners or creditors of the company by interfering with a fair distribution of the recovery among all interested parties; the record revealed that there was no dispute that the plaintiff was the sole member of S Co. and that the loan from S Co. was funded with the plaintiff's personal funds, there was no evidence that creditors of S Co. existed that would have been prejudiced by the plaintiff's recovery, and the trial court's decision to permit the plaintiff to recover directly would not lead to a multiplicity of actions or interfere with a fair distribution of recovery with respect to other interested parties.

3. The trial court did not abuse its discretion in declining to order the defendants to reimburse the plaintiff for the fees he incurred from work performed by W and another accountant retained by the plaintiff to effectuate the winding up process; on the basis of the numerous findings made by the trial court, including the discrepancy of the experience between the parties and the fact that the plaintiff did not timely protect his interests insofar as he failed to hire professional legal and accounting

Saunders *v.* Briner

experts to ensure that the management duties of the companies were properly performed, it was reasonable for the court to determine that the plaintiff's neglect contributed to the complex untangling that W and the other accountant faced during the winding up process.

(*Three justices concurring in part and dissenting in part in one opinion*)

Argued December 20, 2018—officially released December 17, 2019

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the named defendant et al. filed a counterclaim; thereafter, the case was transferred to the judicial district of Waterbury, Complex Litigation Docket, where Sloan Saunders et al. were added as counterclaim defendants; subsequently, the case was tried to the court, *Zemetis, J.*; judgment in part for the plaintiff on the complaint and on the counterclaim, from which the named defendant et al. appealed and the plaintiff cross appealed; thereafter, the court awarded the plaintiff attorney's fees, and the named defendant et al. filed an amended appeal. *Reversed in part*; *order vacated.*

*David P. Friedman*, with whom were *Proloy K. Das* and, on the brief, *Marilyn B. Fagelson*, *Taruna Garg*, *David S. Hoopes* and *Jay R. Lawlor*, for the appellants-cross appellees (named defendant et al.).

*David Feureisen*, pro hac vice, with whom were *Edward N. Lerner* and, on the brief, *George Kent Guarino*, for the appellee-cross appellant (plaintiff).

*Opinion*

KAHN, J. This appeal requires us to consider five issues: (1) whether, in the absence of authorization in a limited liability company's operating agreement, its members or managers lack standing to bring derivative claims on behalf of it under either the Connecticut Limited Liability Company Act (CLLCA), General Stat-

Saunders *v.* Briner

utes (Rev. to 2017) § 34-100 et seq.,[1] or, in the alternative, the common law; (2) whether a trial court may exempt single member limited liability companies from the direct and separate injury requirement necessary to bring a direct action; (3) under what circumstances may a trial court admit opinion testimony of a joint, court-appointed fiduciary hired to wind up the companies at issue when the party who proffered the testimony of the fiduciary failed to disclose him as an expert witness under Practice Book § 13-4; (4) under what circumstances, if any, may the trial court apportion its award of attorney's fees under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., between the plaintiff's CUTPA claims and non-CUTPA claims; and (5) the parameters under which a trial court may order reimbursement for fees incurred by a joint, court-appointed fiduciary hired to wind up the companies at issue. The defendants, Clark Briner and two entities solely owned by Briner, a Connecticut limited liability company and a Texas limited liability company with the same name, Revere Capital, LLC (respectively, Revere Capital CT and Revere Capital TX),[2] appeal,[3] following a bench trial, from the trial court's judgment. The plaintiff, Roger L. Saunders, cross appeals from the trial court's judgment. We reverse the trial court's judgment rendered in favor of the plaintiff

[1] All references herein to the CLLCA are to the 2017 revision. We note that the events underlying this case occurred over the course of several years; we use the 2017 revision in the interest of simplicity. Our legislature has since repealed the CLLCA, effective July 1, 2017, and replaced it with the Connecticut Uniform Limited Liability Company Act, General Statutes § 34-243 et seq.

[2] Revere Investments, LLC, Revere High Yield GP, LLC, Madison Mott, Inc., Revere High Yield Fund, L.P., and Revere Capital Management, LLC, were also named as defendants but are not parties to this appeal. All references herein to the defendants are to Briner, Revere Capital CT and Revere Capital TX.

[3] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Saunders *v.* Briner

as to his derivative claims because we conclude that the plaintiff lacked standing to bring them under the CLLCA or the common law. We, therefore, do not reach the issues of whether the trial court improperly admitted the testimony of a joint, court-appointed fiduciary or whether the trial court incorrectly apportioned the plaintiff's award of attorney's fees under CUTPA. We affirm the trial court's judgment rendered in favor of the plaintiff as to his direct claims and conclude that the trial court did not abuse its discretion in refusing to order the defendants to reimburse the plaintiff for the fees incurred by the joint, court-appointed fiduciary and an accountant hired by him.

The present case arises from the deterioration of a business relationship between three individuals: Briner, the plaintiff, and the plaintiff's son, Sloan Saunders (Saunders). The trial court found the following facts that are relevant to our resolution of this appeal. In 2009, while working together at Deutsche Bank, Saunders and Briner decided to enter into the high interest, high yield commercial real estate lending business by setting up a limited liability company, Revere Investments, LLC (Revere Investments), to act as a servicer of the loans. Initially, Saunders and Revere Capital TX each owned 50 percent of Revere Investments and constituted its comanagers.[4] Although Saunders and Briner chose to enter an industry in which they had little experience, Saunders introduced Briner to the plaintiff, Saunders' father, who had successfully navigated the "hard money lending business" for forty years. Briner and Saunders sought the plaintiff's help in two respects. First, they wanted the plaintiff, who had many contacts in that industry, to help them "establish the relationships necessary to create and maintain" the business.

[4] In February, 2012, as the relationship between Briner and Saunders became increasingly hostile, Saunders transferred his membership interest in Revere Investments to the plaintiff.

Saunders *v.* Briner

Second, Briner and Saunders also needed access to the plaintiff's capital "to fund the high interest loans" before they secured investors to participate in them. The parties often did not secure all the investors necessary to fund a loan prior to closing the transaction with the borrower. Throughout their business relationship, therefore, the plaintiff helped Revere Investments succeed by lending it the capital necessary to close loans before the parties raised the necessary capital to finance it (bridge financing). After Revere Investments raised capital from investors to participate in the loan, it repaid the plaintiff the principal amount of his bridge loan with interest. The trial court found that, without the plaintiff's bridge financing, Revere Investments "would have had little or no business."

The plaintiff, who "desired to teach his son" the business, agreed to source loans, secure investors and financers, and provide bridge financing. Although the plaintiff agreed to provide assistance "to his economic detriment and for the equal and joint benefit" of Saunders and Briner, he "was not willing to forgo the . . . profits on *his* investment or [on] the investment of [others] that he would have earned if he simply invested in hard money loans outside of [Revere Investments]." (Emphasis in original.) The plaintiff, Saunders, and Briner, therefore, created a business arrangement in which the plaintiff and his contacts sourced most of the loans and most of the financing, especially at the beginning of their relationship. Revere Investments would charge the borrower a high interest rate. The parties then found investors to purchase a "participation interest" in the loans on a deal specific basis (outside investors). Outside investors would provide capital in exchange for a return of the principal invested plus a negotiated interest rate.

Revere Investments profited from outside investors by offering them a lower interest rate than it received from the borrower on the underlying loan, which pro-

Saunders *v.* Briner

vided Revere Investments with a profit equal to the difference between the two interest rates (interest rate spread profit). Revere Investments also withheld from outside investors various fees that it charged the borrower, such as extension fees, late fees, and servicing fees. Revere Investments charged the borrower "points"[5] "in connection with most of its loans," and, "[i]n all cases where points were charged, [they] were financed by Revere Investments as part of a loan, so that Revere Investments did not advance to the borrower the full principal amount of the loan, but advanced the principal amount less the points" (net funding). Revere Investments did not pass the points to outside investors, however, who received a return of principal and interest only on the amount they actually invested.

Saunders, Briner, the plaintiff, or their respective family members (inside investors) who participated in a loan, by contrast, did profit from points charged to borrowers. The advantageous treatment for inside investors derived from the fact that, unlike the outside investors, they received a return of principal plus interest on the face amount of their investment in the loan, despite the fact that they had not funded the full face amount.[6] This technique of "grossing up" allowed inside investors to receive a higher return on their investment than an outside investor who participated equally in a loan.

As part of the parties' agreement[7] to gross up inside investments, the parties additionally agreed that—in

---

[5] One point equaled 1 percent of the face or "gross" amount of the loan.

[6] The trial court provided the following example: "If an inside investor invested [$1 million], and received six 'points' (a 6 percent of the gross loan 'origination fee' from the borrower), the inside investor could either . . . present a [$1 million] check to [Revere Investments] and receive back a $60,000 check (points fee on the investment) from [Revere Investments] or simply present [to Revere Investments] a $940,000 check—but either way, the inside investor would be paid interest by [Revere Investments] on the [$1 million] investment."

[7] The trial court found that "[t]he partners initially [orally] agreed that inside investors would receive interest on the 'face amount' of their invest-

Saunders *v.* Briner

exchange for his help—the plaintiff "would also keep both the 'interest rate spread profit' . . . and the 'fees' earned on certain identified and agreed upon *nonfamily* [*investments*]." (Emphasis added.) This allowed the plaintiff to earn profits that Revere Investments otherwise would have earned on the outside investors he sourced. The oral agreement, however, did not give Briner the same rights with respect to the outside investors he sourced.

By mid-2011, Briner had grown dissatisfied with the arrangement allowing the plaintiff but not Briner to profit from outside investors sourced by each of them respectively, because, by that time, Revere Investments' business model and the parties' respective responsibilities had changed. Saunders, Briner and the plaintiff had created—at the request of Briner—a second entity, Revere High Yield Debt Fund, L.P. (Fund), which provided a vehicle for pooling outside investor capital, and a controlling general partner of the Fund, Revere High Yield, GP, LLC (Fund GP), which "was owned equally [and comanaged] by [the plaintiff] and Briner . . . ." Under this revised arrangement, Revere Investments' loans were funded by various combinations of investments, including (1) financing from the Fund, which would pool money from outside investors and buy a single participation interest in a loan, (2) capital from inside investors, and (3) capital from outside investors

ment (not reduced by the origination fee they received during the loan closing), including a pro rata share of the points Revere Investments charged on a loan. Using this method, inside investors rather than Revere Investments would also receive interest-on-points profit regarding investments of [insider] capital. [The plaintiff] would also keep both the 'interest rate spread profit' and the 'fees' earned on certain identified and agreed upon [nonfamily] 'inside investors' funds. During the years of operation, these agreements deprived [Revere Investments] of considerable profits and benefitted [the plaintiff], but this was obvious and understood when the parties agreed upon this conduct at the inception of their business. . . . Though [Briner] denied such an agreement, the court rejects his testimony on this point and accepts the evidence, testimonial and documentary, confirming the parties' agreement." (Footnote omitted.)

Saunders *v.* Briner

that chose to participate in a particular loan alongside
the Fund (side car investments)[8].

The parties' formation of the Fund and Fund GP
expanded Revere Investments' "loan portfolio size . . .
[thereby] increasing the 'back office' workload.'' During
that time, however, Saunders had accepted and begun a
full-time job at another investment firm, which required
him to work sixty to seventy hours per week. This
placed a strain on Briner's relationship with Saunders,
because Briner—concerned that Saunders left him to
handle much of the work himself, including sourcing
the loans and finding the Fund investors—felt that he
worked "*disproportionately greater*" than Saunders yet
profited less because he could not derive profits from
the outside investors he sourced in the same way as
the plaintiff did.

Eventually, Briner demanded that the plaintiff and
Saunders allow him to "skim the same . . . profits''
from Revere Investments and the Fund on his outside
investors that the plaintiff received on the investors
he sourced. Both the plaintiff and Saunders refused.
Despite their refusal, and without their knowledge,
Briner created Revere Capital CT, which constituted
an inside investor as Briner owned 100 percent and
which enabled Briner to conceal the true source of the
funds he sourced by placing investments of outsider
capital into that company as opposed to the Fund or
Revere Investments. Consequently, when Revere Capi-
tal CT participated in Revere Investments' loans, either
through the Fund or as a side car investment, Briner
was able to treat those outside investments as insider
capital, allowing him to retain "100 percent of the profits
associated therewith,'' including a benefit from the ele-
vated treatment of points. This conduct effectively

---

[8] Side car investments "differ from investments *in* the Fund in that, [as
a side car] an investor invests in a single loan chosen by the investor, while
in the [Fund] the investment is . . . pooled'' with other capital and
"invest[ed] in multiple loans.'' (Emphasis in original.)

Saunders *v.* Briner

"erased the distinction between the treatment of [Briner's] 'inside and outside investors,' negatively affecting the profits of [Revere Investments] and/or the Fund and correspondingly increasing [Briner's] personal profits.''

In addition to diverting outside capital away from Revere Investments and the Fund in order to profit off of those investments as if they were his own insider capital, Briner also misallocated investor profits by withholding interest on points from the other inside investors, so that they received a return only on the net amount they invested. At the same time, Briner grossed up investments made by his inside investors. Briner also improperly[9] charged Revere Investments for expenses incurred by Revere Capital TX,[10] including employment, rent, travel and advertising expenses. In

[9] The trial court found that Briner "mistreated his business partners by . . . improperly allocating expenses for employees, equipment, supplies, travel, and rent from his privately owned [Revere Capital] to [Revere Investments] and the Fund, by unilaterally altering the long-standing and agreed upon allocation of profits amongst inside/outside/and owners of [Revere Investments] and the Fund, and by improper accounting methods.''

[10] The trial court found that, "[i]n 2006, [Briner] had created, and solely owned, Revere Capital [TX], a Texas entity . . . and engaged in the business of 'hard money lending' before partnering with [Saunders and the plaintiff] in the involved ventures. In 2010, [Briner] created, and solely owned, Revere Capital [CT], a Connecticut entity . . . .'' The record reveals that, in addition to owning Revere Capital TX prior to the inception of Revere Investments, the parties orally agreed to use "Revere Capital [TX] as the marketing arm'' of Revere Investments, as Briner—who made two equity investments through that entity prior to forming Revere Investments with Saunders— felt that he already "had investors that were used to investing in Revere Capital [TX].'' Saunders testified that, around the time that the plaintiff commenced litigation, he and the plaintiff learned that Briner had created Revere Capital CT after the parties started Revere Investments. The trial court found that, "[o]n four loans . . . [Briner] intentionally and deliberately violated the agreement [he had] reached with [the plaintiff and Saunders] in the operation of [Revere Investments] and the Fund by placing undisclosed outside capital in [Revere Capital TX and/or Revere Capital CT] then having [Revere Capital TX and/or Revere Capital CT] participate in the loans as an 'inside investor.' '' (Footnote omitted.) When questioned at trial whether Briner placed outside capital into Revere Capital CT, rather than Revere Capital TX, to treat those outside investments as his own insider capital and divert profits from Revere Investments, Briner testified that he did not keep separate books and records for each company and could not distinguish between them.

146 DECEMBER, 2019 334 Conn. 135

Saunders *v.* Briner

mid-2012, after Saunders discovered Briner's misallocation of points in some of Revere Investments' loan spreadsheets, he and the plaintiff hired outside accountants and legal counsel, who exposed[11] "the extent of [Briner's] incompetent and inconsistent management of [Revere Investments], the Fund, and Fund GP . . . ."

In November, 2012, the plaintiff commenced this action and, in May, 2014, filed the operative twenty-seven count second amended complaint[12] against the defendants, consisting of fourteen direct counts brought by the plaintiff, individually, and thirteen derivative counts brought on behalf of Revere Investments, Fund GP, or both.[13] In addition to moving for judicial dissolution of Revere Investments and Fund GP in

---

[11] The trial court found that, "[b]y July, 2012 . . . [b]ookkeeping and accounting errors in the management of [Revere Investments] and the Fund were identified by accountants and counsel. The extent of [Briner's] incompetent and inconsistent management of [Revere Investments], the Fund, and Fund GP was discovered and identified, the misallocation of investors' profits uncovered, and the attribution of [Briner's] solely owned company expenses to [Revere Iinvestments]/Fund was exposed."

[12] The defendants asserted ten special defenses and a thirty-three count counterclaim. The trial court deemed the defendants' special defenses abandoned, as the defendants "neither briefed nor argued" them. The defendants withdrew all but nine counts of their counterclaim before the trial court rendered judgment. Following a bench trial, that court then rendered judgment in favor of the plaintiff on counts three, nineteen through twenty-two, and twenty-eight of the defendants' counterclaim. The trial court rendered judgment in favor of the defendants on their counterclaim counts thirty through thirty-three and ordered a declaratory judgment in connection with those counts.

[13] Prior to trial, the trial court granted the defendants' motion to strike the following counts: direct count seven, alleging a violation of the Connecticut Uniform Securities Act; direct count eleven and derivative count nine, alleging statutory theft; direct count twelve and derivative count ten, alleging conversion; and derivative counts three and five, alleging breach of the implied covenant of good faith and fair dealing. The plaintiff withdrew derivative count thirteen, alleging breach of the Fund's limited partnership agreement.

Following trial, the court also rendered judgment in favor of Madison Mott, Inc., a company owned by Briner's wife, on direct counts thirteen and fourteen and derivative counts eleven and twelve, alleging facilitation of breach of fiduciary duty and violations of CUTPA.

Saunders *v.* Briner

direct count one, the plaintiff asserted both direct and
derivative counts alleging common-law fraud,[14] breach
of contract,[15] breach of the implied covenant of good
faith and fair dealing,[16] breach of fiduciary duty,[17] and
violations of CUTPA and the Connecticut Uniform Secu-
rities Act.[18]

After the plaintiff initiated the action, the parties
agreed to hire a joint, court-appointed fiduciary, Citrin
Cooperman and Company, LLP (Citrin), to wind up the
Fund and Fund GP. After a team led by Citrin's partner
Alan A. Schachter examined sixteen of Revere Invest-
ments' loans, "totaling nearly $18 million" of Revere
Investments' approximately $40 million loan portfolio,
Schachter wrote a report containing Citrin's findings.
In that report, Schachter noted that the team "found a
lack of internal controls" and "a number of . . . report-
ing and recording problems," which he noted were "not
surprising . . . given the lack of oversight and the

[14] In direct count two and derivative count one, the plaintiff alleged com-
mon-law fraud against the defendants.

[15] In direct count three and derivative count two, directly and on behalf
of Revere Investments, the plaintiff alleged breach of Revere Investments'
operating agreement against Revere Capital TX. In direct count five and
derivative count four, directly and on behalf of Fund GP, the plaintiff alleged
breach of Fund GP's limited liability company agreement against Briner.

[16] In direct counts four and six, the plaintiff alleged breach of the implied
covenant of good faith and fair dealing against Revere Capital TX and
Briner, respectively.

[17] In direct counts nine and ten and derivative counts seven and eight,
the plaintiff alleged breach of fiduciary duty directly and on behalf of Revere
Investments and Fund GP against Revere Capital TX and Briner, respectively.
In direct count thirteen and derivative count eleven, the plaintiff alleged
facilitation of the breach of fiduciary duty against Madison Mott, Inc.

[18] In direct count seven and derivative count twelve, the plaintiff alleged
violations of the Connecticut Uniform Securities Act, directly against the
defendants and on behalf of Revere Investments against Madison Mott, Inc.,
as to the derivative claim. In direct count eight and derivative count six,
directly and on behalf of Revere Investments, respectively, the plaintiff
alleged violations of CUTPA against the defendants. Moreover, in addition
to his CUTPA claims against the defendants, in direct count fourteen, the
plaintiff alleged violations of CUTPA against Madison Mott, Inc.

Saunders *v.* Briner

complexity of the investments.'' Schachter concluded that Revere Investments, the Fund, and Fund GP, ''as managed by Briner, had underpaid both the investors and the principals, particularly [the plaintiff].'' During the bench trial, the plaintiff called Schachter to testify at trial regarding the findings he outlined in his report. Over Briner's objection, the trial court allowed Schachter to testify and admitted his report into evidence.

Following a ten day bench trial, in which the parties distilled ''897 trial exhibits exceed[ing] several hundred thousand pages in length,'' the trial court rendered judgment in favor of the plaintiff on four of his thirteen derivative counts and four of his fourteen direct counts. Under derivative counts two and six, which alleged, on behalf of Revere Investments, breach of contract against Revere Capital TX and violations of CUTPA against the defendants, respectively, the trial court ordered the defendants to pay Revere Investments one payment of $284,600. Under derivative counts seven and eight, which alleged breach of fiduciary duty on behalf of Revere Investments and Fund GP, respectively, the trial court ordered Revere Capital TX to pay Revere Investments and/or the Fund GP one payment of $92,797, under counts seven and eight, and an additional $71,000 under count seven. Under direct counts four and six, alleging breach of the implied covenant of good faith and fair dealing against Revere Capital TX and Briner, respectively, and counts nine and ten, alleging breach of fiduciary duty on the part of Briner and Revere Capital TX, the trial court awarded the plaintiff one payment of $85,078 in connection with the failure to repay one of the plaintiff's loans to Revere Investments. As to direct counts four and six, however, the court rejected the plaintiff's claim that the court should direct Briner to reimburse him for ''fees [related to] tax and accounting experts,'' including Schachter.

Saunders *v.* Briner

After the court rendered judgment, it held a hearing to determine the appropriate amount of attorney's fees to award the plaintiff under derivative count six, which alleged that the defendants had violated CUTPA through Briner's diversion of outside capital into Revere Capital CT. After the posttrial hearing, the trial court filed a memorandum of decision and supplemental order awarding the plaintiff $639,054.91 in attorney's fees pursuant to General Statutes § 42-110g. This appeal followed.

The issues presented for resolution on appeal are numerous. The defendants first challenge the plaintiff's standing to bring any of the direct or derivative counts for which the trial court rendered judgment in his favor. The defendants appeal from the trial court's judgment in favor of the plaintiff as to his claims under derivative counts two, six, seven, and eight—alleging breach of contract, violations of CUTPA, and breach of fiduciary duty—claiming that the trial court lacked subject matter jurisdiction to review the plaintiff's derivative counts, because the CLLCA, the statutory scheme in place at the time the plaintiff commenced his action, did not provide a derivative remedy. Additionally, the defendants claim that, in the absence of such statutory authority by the legislature under the CLLCA, the common law does not afford a member or manager of a limited liability company derivative standing, because the CLLCA, the statute that created that company structure, solely governs this issue. The plaintiff responds that trial courts have interpreted the CLLCA as permitting derivative claims. In the alternative, the plaintiff claims that this court should conclude that the common law grants him derivative standing.

The defendants also appeal from the trial court's judgment in favor of the plaintiff as to his claims under direct counts four, six, nine, and ten, alleging breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing. The defendants claim

Saunders *v.* Briner

that the plaintiff lacked standing to challenge Briner's failure to repay one of the plaintiff's loans to Revere Investments, because the plaintiff's single-member limited liability company, Saunders Capital, LLC (Saunders Capital), provided the investment at issue and, therefore, constituted the proper party to bring the action. The plaintiff responds that, because he funded the investment with his personal capital, he satisfies the requirements for direct standing regardless of the source of his investments.

Additionally, the defendants appeal from the trial court's judgment in favor of the plaintiff as to derivative counts seven and eight, claiming, specifically, that the trial court abused its discretion in admitting Schachter's testimony because the plaintiff failed to disclose him as an expert pursuant to Practice Book § 13-4. The plaintiff responds that the trial court did not abuse its discretion in admitting Schachter's testimony in the absence of expert disclosure because he did not call Schachter to testify as an expert but, rather, as a fact witness testifying in his capacity as the court-appointed fiduciary. To the extent that the trial court allowed Schachter to provide expert opinion, the plaintiff claims, Briner suffered no prejudice from its admission, and the trial court needed Schachter's assistance in understanding the complex calculations required to determine what Revere Investments owed to its investors and principals.

Finally, the defendants appeal from the trial court's award of attorney's fees under derivative count six, on which the trial court rendered judgment for the plaintiff under CUTPA. The defendants claim that the trial court improperly awarded attorney's fees associated with both the plaintiff's CUTPA and non-CUTPA claims, rather than those fees attributable only to the CUTPA claims. The plaintiff responds that the trial court properly apportioned attorney's fees under CUTPA because, when parties litigate both CUTPA and non-CUPTA

Saunders *v.* Briner

claims in the same action and those claims involve the same inextricably entwined facts, the trial court does not need to apportion the payment of attorney's fees only to work performed on the CUTPA related claims.

The plaintiff cross appeals from the trial court's judgment on his direct counts four and six insofar as he claims that the trial court abused its discretion in refusing either to order Briner to reimburse Revere Investments for the fees incurred by Schachter and another accountant hired by him or to hold a hearing for the purpose of apportioning those fees. The defendants respond that the trial court properly rejected the plaintiff's request for reimbursement because it determined that all of the owners of Revere Investments, including the plaintiff, bore some responsibility for failing to ensure that Revere Investments operated in accordance with proper bookkeeping and accounting procedures.

We affirm the trial court's judgment rendered in favor of the plaintiff on his direct counts, including its determination not to apportion the fees incurred by Schachter and another accountant hired by him. Because we conclude, however, that the plaintiff lacked standing to bring his derivative claims, we reverse the trial court's judgment in favor of the plaintiff on his derivative counts and vacate the court's award of attorney's fees under CUTPA. Additionally, because we conclude that the plaintiff lacked standing to bring his derivative claims, we do not reach the issue of whether the trial court improperly admitted Schachter's testimony.

I

STANDING

The first two issues we resolve, regarding the standing our state affords to members of limited liability companies to bring derivative claims under the CLLCA and certain direct claims, present matters of first impression. First, the defendants claim that the trial

Saunders *v.* Briner

court incorrectly determined that the plaintiff had standing to bring derivative claims against them. Second, the defendants contend the plaintiff lacked standing to bring direct claims against Briner for failing to repay the remainder of one of the plaintiff's loans to Revere Investments when that company's books and records indicate that the plaintiff's solely owned limited liability company, Saunders Capital, rather than the plaintiff himself, provided the capital.

A

Derivative Standing

We begin by addressing whether, in the absence of authorization in the operating agreements of Revere Investments and Fund GP,[19] the plaintiff lacked standing to bring derivative claims on behalf of those companies under either General Statutes (Rev. to 2017) § 34-187 or, in the alternative, the common law. The defendants claim for the first time on appeal that the plaintiff, a 50 percent member of Revere Investments and Fund

---

[19] The parties could have authorized the filing of derivative actions in the operating agreements of Revere Investments and Fund GP. See *Styslinger* v. *Brewster Park, LLC*, 321 Conn. 312, 317, 138 A.3d 257 (2016) (noting that CLLCA provides default rules regarding operation of limited liability companies but permits "members to supplement these statutory provisions by adopting an operating agreement to govern the [company's] affairs"); *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 837, 43 A.3d 607 (2012) ("[T]he statutory scheme controls and provides for the default method of operation, unless the organizers or members of the limited liability company contract, through the operating agreement, for another method of operation. Indeed, this is one of the foundational principles of the law governing limited liability companies."); 3 L. Ribstein & R. Keatinge, Limited Liability Companies (2d Ed. 2011) Appendix C, p. App. C-109 ("this section does not permit derivative suits unless they are provided for in the operating agreement"). Because the operating agreements of Revere Investments and Fund GP are silent as to the parties' abilities to bring a derivative action, however, we conclude that no such contractual authorization exists in the present case, and the plaintiff's right to sue in a derivative capacity, if it exists, must emanate from the CLLCA or the common law.

GP, lacked standing to bring derivative claims on behalf of those companies under § 34-187 of the CLLCA, the operative statute at the time the plaintiff commenced the present litigation. Further, the defendants claim that, in the absence of legislative authority under the CLLCA, there is no common-law authority granting a member or manager of a limited liability company derivative standing. The plaintiff responds that, although this court has never addressed whether limited liability company members or managers can sue derivatively, other courts have interpreted the CLLCA as permitting it. In the alternative, the plaintiff claims that this court should conclude, as other courts have, that the common law grants him derivative standing.[20] We conclude that,

[20] As a second alternative—that is, if this court were to conclude that the plaintiff lacked standing under the CLLCA and the common law to bring his derivative claims—the plaintiff asks that we conclude, nevertheless, that the trial court retained subject matter jurisdiction over his claims because "the same judicial result would [have] occur[ed] under the court's order awarding judicial dissolution" pursuant to General Statutes (Rev. to 2017) § 34-207. The defendants respond that, because the parties agreed to dissolve the companies, the trial court did not need to make any of its findings to resolve that count. We conclude that, "[b]ecause the plaintiff did not request with specificity any other form of relief besides a dissolution" in count one of his complaint, the plaintiff lacked a legal basis to seek "some other form of relief besides dissolution and winding up." *Styslinger* v. *Brewster Park, LLC*, 321 Conn. 312, 315, 138 A.3d 257 (2016).

In *Styslinger*, this court was asked to determine whether an assignee of a membership interest in a limited liability company had standing to seek a court order winding up the company. Id., 313–14. After concluding that assignees lack standing to seek such orders, we noted that, "[a]ssuming for the sake of argument that an assignee is entitled to seek some other relief, including money damages, for wrongful conduct on the part of the members or managers of [a limited liability company], the plaintiff did not explicitly ask for any other relief besides a court-ordered dissolution and winding up of [that company's] affairs in his complaint. Although the plaintiff requested '[s]uch other and further relief as in law or equity may appertain,' the trial court properly concluded that a more specific request was necessary to put the defendants on notice that the plaintiff was seeking some other form of relief besides dissolution and winding up." Id., 315 n.2.

In *Styslinger*, therefore, we indicated that we would reject a "catchall prayer for relief" to satisfy a claim for money damages when dissolving and winding up a limited liability company. Id. In the present case, the plaintiff

Saunders *v.* Briner

in the absence of a provision in the operating agreements of the respective companies authorizing the filing of derivative lawsuits, the plaintiff lacked standing to bring his derivative claims on behalf of Revere Investments and Fund GP because neither the CLLCA nor the common law provided for a derivative remedy at the time the plaintiff commenced the present action.[21]

The record reveals the following additional facts that are relevant to our resolution of this claim. The oper-

failed to ask for any form of damages under count one but, rather, asked only that the court judicially dissolve Revere Investments and Fund GP. Although the plaintiff requested additional relief at the end of his fifty-one page complaint, the specific requests for damages expressly relate to other counts of the complaint. Additionally, where the plaintiff lists an individual request for relief asking solely for judicial dissolution, he fails to mention any additional damages. Finally, as we noted in *Styslinger*, the plaintiff's catchall prayer requesting "such other and further relief, both legal and equitable, as the court, in its discretion, may deem just and proper," does not suffice to confer standing to seek damages based on the derivative counts in his complaint.

[21] Our conclusion that the plaintiff lacked standing to bring the derivative claims, including the CUTPA counts, disposes of the issues relating to attorney's fees under CUTPA and the challenges to the admission of expert testimony. We observe that, in order to sustain a legal basis for attorney's fees, a plaintiff must first succeed on the merits of his CUTPA claim. See, e.g., *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services*, *LLC*, 308 Conn. 312, 329, 63 A.3d 896 (2013) ("CUTPA . . . affords a trial court discretion to award attorney's fees if a violation is established"); *Vezina* v. *Nautilus Pools*, *Inc.*, 27 Conn. App. 810, 821, 610 A.2d 1312 (1992) ("[t]he moving party must prevail on the CUTPA cause of action before such fees and damages must be awarded"). Accordingly, because we conclude that the plaintiff lacked standing to bring derivative CUTPA claims under the CLLCA, and he has not articulated an alternative basis upon which to grant him attorney's fees, we do not reach the issue of whether the trial court incorrectly apportioned attorney's fees under the plaintiff's derivative CUPTA counts.

In addition, because we conclude that the plaintiff lacked standing to bring derivative counts seven and eight—which alleged breach of fiduciary duty on behalf of Revere Investments and Fund GP, respectively—we do not reach the issue of whether we should reverse the trial court's judgment in favor of the plaintiff as to those counts on the ground that it abused its discretion in admitting the opinion testimony of Schachter—the joint, court-appointed fiduciary hired to wind up the companies at issue—when the plaintiff, who called Schachter to testify, failed first to disclose him as an expert witness under Practice Book § 13-4.

Saunders *v.* Briner

ating agreements of Revere Investments and Fund GP list Briner and/or Revere Capital TX as both a 50 percent member and comanager of those companies. The operating agreement of Fund GP also lists the plaintiff as a 50 percent member and comanager of that company, and evidence at trial indicated that Saunders transferred his 50 percent interest in Revere Investments to the plaintiff in February, 2012.[22] Additionally, the operating agreements of both companies vest the authority to manage the business of each company in its managers (manager-managed). Neither company's operating agreement, however, authorizes its members or managers to bring a derivative action.

In his second amended complaint, in which the plaintiff added derivative claims on behalf of Revere Investments and Fund GP in thirteen separate counts, the plaintiff alleged that, as a member or manager of the companies, he "fully and adequately represent[ed] [their] interests . . . ." He further alleged that he "made demands . . . of Briner on behalf of Revere Investments and [Fund] GP to remedy the issues" upon which he based his claims. To the extent that he failed to make "any formal demand," the plaintiff claimed, "it was [because] such a demand would be futile . . . ."

In its memorandum of decision, the trial court concluded that the plaintiff had standing. With respect to the four derivative counts on which the trial court rendered judgment in favor of the plaintiff, the court noted that, "[i]nsofar as [the plaintiff] alleges misconduct that damaged investors, other than himself, he fairly and

---

[22] The record indicates that, although Saunders transferred his membership interest in Revere Investments to the plaintiff, the plaintiff did not become a comanager of that company. The plaintiff's status as a member but not a manager of Revere Investments does not affect our legal analysis under § 34-187, as that statute clearly provides that any member of a limited liability company, *regardless of whether that company vests management responsibilities in its members or managers,* may bring an action in the name of the company upon the vote of a majority of disinterested members.

Saunders *v.* Briner

adequately represents the interests of investors in [Revere Investments] and . . . Fund [GP].'' The court reasoned that the plaintiff constituted ''an investor . . . and a co-owner of [Revere Investments] (after February, 2012),'' and ''a manager and co-owner of Fund GP.''

We begin our review of the trial court's determination with the general principles governing standing to sue. ''If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record.'' (Internal quotation marks omitted.) *PNC Bank, N.A.* v. *Kelepecz*, 289 Conn. 692, 704– 705, 960 A.2d 563 (2008). ''In addition, because standing implicates the court's subject matter jurisdiction, the issue of standing is not subject to waiver and may be raised at any time.'' *Equity One, Inc.* v. *Shivers*, 310 Conn. 119, 126, 74 A.3d 1225 (2013).

''Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also

Saunders *v.* Briner

is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. . . .

"Two broad yet distinct categories of aggrievement exist, classical and statutory.'' (Internal quotation marks omitted.) *PNC Bank*, *N.A.* v. *Kelepecz*, supra, 289 Conn. 705. The issue of whether the CLLCA provided the plaintiff with a derivative remedy implicates statutory aggrievement, which "exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation.'' (Internal quotation marks omitted.) Id.

"In order to determine whether a party has standing to make a claim under a statute, a court must determine the interests and the parties that the statute was designed to protect. . . . Essentially the standing question in such cases is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. . . . [Stated differently, the] plaintiff must be within the zone of interests protected by the statute.'' (Citation omitted; internal quotation marks omitted.) *McWeeny* v. *Hartford*, 287 Conn. 56, 65, 946 A.2d 862 (2008).

The issue of whether the CLLCA authorizes a member or manager of a limited liability company to bring a derivative action on its behalf presents a question of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent). We begin by noting that Connecticut first recognized the

Saunders *v.* Briner

limited liability company structure in 1993 when our legislature enacted the CLLCA, a statutory scheme it modeled after the Prototype Limited Liability Company Act (Prototype Act).[23] See *Scarfo* v. *Snow*, 168 Conn. App. 482, 500 n.9, 146 A.3d 1006 (2016) (Connecticut's limited liability company statutory provisions were modeled after Prototype Act). We recently recognized that our legislature enacted the CLLCA in order to establish "the right to form [a limited liability company] and all of the rights and duties of the [limited liability company], as well as all of the rights and duties of members . . . ." *Styslinger* v. *Brewster Park, LLC*, 321 Conn. 312, 317, 138 A.3d 257 (2016).

On the basis of the plain language of the act, we conclude that the CLLCA does not permit members or managers to file derivative actions but, rather, authorizes them to collectively commence an action in the name of the limited liability company upon a requisite vote of disinterested members or managers (member initiated action). The CLLCA recognizes the right of the limited liability company "to . . . sue and be sued." General Statutes (Rev. to 2017) § 34-124 (b). General Statutes (Rev. to 2017) § 34-186 generally authorizes "[s]uits . . . brought by or against a limited liability company *in its own name*." (Emphasis added.) Section 34-187[24] provides the procedure that members or man-

---

[23] The Prototype Act was drafted in 1992 by the Working Group on the Prototype Limited Liability Company Act, Subcommittee on Limited Liability Companies, Committee on Partnerships and Unincorporated Business Organizations of the Business Law Section of the American Bar Association. See 3 Ribstein & R. Keatinge, Limited Liability Companies (2d Ed. 2011) Appendix C, p. App C-109.

[24] General Statutes (Rev. to 2017) § 34-187 provides: "(a) Except as otherwise provided in an operating agreement, suit on behalf of the limited liability company may be brought in the name of the limited liability company by: (1) Any member or members of a limited liability company, whether or not the articles of organization vest management of the limited liability company in one or more managers, who are authorized to sue by the vote of a majority in interest of the members, unless the vote of all members shall be required pursuant to subsection (b) of section 34-142; or (2) any manager or managers

334 Conn. 135 DECEMBER, 2019 159

Saunders *v.* Briner

agers must follow if they wish to file a lawsuit in the name of the company. Section 34-187 (a) (1) and (b) authorizes any member of a limited liability company, regardless of whether that company vests management responsibilities in its members or managers, to bring an action in the name of the company *upon the vote of a majority of disinterested members*. Likewise, § 34-187 (a) (2) authorizes any manager of a manager-managed limited liability company to bring an action in the name of that company upon the vote necessary under General Statutes (Rev. to 2017) § 34-142 (a), which requires "more than one-half by number of [disinterested] managers . . . ."

Connecticut modeled the procedure set forth in § 34-187 on § 1102 of the Prototype Act.[25] The drafters of the Prototype Act expressly "emphasize[d] that [§ 1102]

of a limited liability company, if the articles of organization vest management of the limited liability company in one or more managers, who are authorized to sue by the vote required pursuant to section 34-142.

"(b) In determining the vote required under section 34-142 for purposes of this section, the vote of any member or manager who has an interest in the outcome of the suit that is adverse to the interest of the limited liability company shall be excluded."

[25] Section 1102 of the Prototype Act provides: "Unless otherwise provided in an operating agreement, a suit on behalf of the limited liability company may be brought only in the name of the limited liability company by:

"(a) One or more members of a limited liability company, whether or not an operating agreement vests management of the limited liability company in one or more managers, who are authorized to sue by the vote of more than one half by number of the members eligible to vote thereon, unless the vote of all members shall be required pursuant to § 403 (B), provided that in determining the vote required under § 403, the vote of any member who has an interest in the outcome of the suit that is adverse to the interest of the limited liability company shall be excluded; or

"(b) One or more managers of a limited liability company, if an operating agreements vests management of the limited liability company in one or more managers, who are authorized to do so by the vote required pursuant to § 403 of the members eligible to vote thereon, provided that in determining such required vote, the vote of any manager who has an interest in the outcome of the suit that is adverse to the interest of the limited liability company shall be excluded." See 3 L. Ribstein & R. Keatinge, Limited Liability Companies (2d Ed. 2011) Appendix C, pp. App. C-107 through App. C-108.

160 DECEMBER, 2019 334 Conn. 135

Saunders *v.* Briner

does not permit derivative suits unless they are pro-
vided for in the operating agreement.'' 3 L. Ribstein &
R. Keatinge, Limited Liability Companies (2d Ed. 2011)
Appendix C, p. App. C-109.[26] Instead, the drafters
intended to create a substitute for the derivative action,

---

[26] The type of action contemplated in the Prototype Act differs from a
derivative action, the drafters explained, because § 1102 of the Prototype
Act creates procedures to permit disinterested members or managers who
agree to sue in the company's name to bring an action—that is, to initiate
a suit by the company—rather than permitting ''a single member to sue on
behalf of the [limited liability company] . . . .'' See 3 L. Ribstein & R.
Keatinge, supra, p. App. C-109; id., pp. App. C-109 through App. C-110 (''[s]uit
by a single member arguably is appropriate in public corporations because
the members are generally passive and uninvolved in management and in
any event too numerous to coordinate effectively for action against errant
managers . . . [whereas] it may not be worth it in closely held firms like
the typical [limited liability company] . . . [in which] members can be
expected to be actively interested in the firm, and . . . can readily be
coordinated for a vote on a suit by the firm''); J. Burkhard, ''Resolving LLC
Member Disputes in Connecticut, Massachusetts, Pennsylvania, Wisconsin,
and the Other States that Enacted the Prototype LLC Act,'' 67 Bus. Law.
405, 409 (2012) (comparing derivative action's ''dual purpose,'' in which
shareholders first compel corporation to sue and then file suit on its behalf,
with Prototype Act's direct action, which lacks precondition that company
failed to act). We observe that, unlike the member initiated action provided
in § 34-187, the section authorizing a single member to bring a derivative
action under our new limited liability company statute—the Connecticut
Uniform Limited Liability Company Act (CULLCA), General Statutes § 34-
243 et seq.—requires a two step process. First, under General Statutes § 34-
271a, a member of a manager-managed limited liability company who desires
to bring a derivative action must first attempt to compel the company to
sue by serving upon the other managers ''a demand . . . [to] cause the
company to bring an action . . . .'' Second, if the managers fail to ''bring
the action within ninety days'' or a demand on them ''would be futile,'' then
the member may file suit on behalf of the company. General Statutes § 34-
271a (1) and (2).

Burkhard and other commentators have noted that some courts, appar-
ently overlooking commentary by the drafters of the Prototype Act, have
conflated the member initiated action with the derivative action. See, e.g.,
J. Burkhard, supra, 67 Bus. Law. 411 (''[i]n spite of the rather clear direction
that Prototype Act [§] 1102 replaces the derivative suit . . . such has not
always been how the courts have applied their respective statutes, and there
appears to be substantial confusion among the courts as to how the statute
should be applied''); A. Gladden, ''Beyond Direct vs. Derivative: What *Muccio*
v. *Hunt* Tells Us about Arkansas LLCs,'' 51 Ark. Law. 34, 35 (2016) (ques-

Saunders *v.* Briner

which they deemed more appropriate "in closely held firms like the typical [limited liability company] . . . [in which] members can be expected to be actively interested in the firm, and . . . can readily be coordinated for a vote on a suit by the firm." Id., p. App. C-110. The "extra expense" and procedural hurdles required to bring a derivative action, the drafters reasoned, "may not be worth it" in the limited liability company context; id.; which differs from that of "public corporations . . . [where] the members are generally passive . . . uninvolved in management and . . . too numerous to coordinate effectively for action against errant managers." Id., p. App. C-109.

We conclude, therefore, that, in adopting a functionally identical provision to § 1102 of the Prototype Act, our legislature chose to omit the derivative action under the CLLCA for members and managers of limited liability companies.[27] Consequently, the plaintiff in the pres-

tioning decision of Arkansas Supreme Court applying shareholder derivative action principles to limited liability companies despite existence of member initiated action in its limited liability company statute).

[27] Our conclusion is consistent with the context surrounding our legislature's enactment of the CLLCA and its enactment of our current limited liability company statute, the Connecticut Uniform Limited Liability Company Act (CULLCA), General Statutes § 34-243 et seq. Not only did our legislature decline to provide for a derivative cause of action in the CLLCA but, when it enacted the CLLCA, it also did not modify our derivative action statute, General Statutes § 52-572j, to include limited liability companies. See *Ward* v. *Gamble*, Docket No. CV-08-5017829-S, 2009 WL 2781541, *3 (Conn. Super. July 23, 2009). The fact that the legislature did not modify § 52-572j after its enactment of the CLLCA suggests that it did not intend to allow derivative actions for that type of corporate structure. See, e.g., *Hartford/Windsor Healthcare Properties*, *LLC* v. *Hartford*, 298 Conn. 191, 198, 3 A.3d 56 (2010) ("[t]he legislature is always presumed to have created a harmonious and consistent body of law" [internal quotation marks omitted]).

Additionally, our interpretation that the legislature intended to omit a statutory derivative remedy in the CLLCA is strengthened by its later choice to expressly include that authority in the CULLCA. See, e.g., *Celentano* v. *Oaks Condominium Assn*, 265 Conn. 579, 597, 830 A.2d 164, 176 (2003) (citing cases that note that "subsequent legislative act may throw light on the legislative intent of an earlier related act" [internal quotation marks omitted]). The defendants claim that the legislature did not intend for the

Saunders *v.* Briner

ent case failed to allege that he undertook the proper procedure to maintain standing under the CLLCA. Although the allegations set forth in the plaintiff's second amended complaint—namely, that he was a member or manager of both companies and that either he made demands on Briner or such demands were futile—comport with the procedural requirements for bringing a derivative action under the CULLCA, they do not comply with the requirements for bringing a member initiated action under the CLLCA.[28]

CULLCA to apply retroactively. Because the CULLCA expressly provides that it applies prospectively; see General Statutes § 34-283b; and the plaintiff filed the present action in November, 2012, we agree. See, e.g., *D'Eramo* v. *Smith*, 273 Conn. 610, 621, 872 A.2d 408 (2005) ("procedural or remedial statutes are intended to apply retroactively [only] absent a clear expression of legislative intent to the contrary" [internal quotation marks omitted]).

[28] We recognize that, "because of the closely held nature of many [limited liability companies] there may be little difference between the derivative remedy and the one proposed in this section." 3 L. Ribstein & R. Keatinge, supra, p. App. C-110. Practically, the two types of actions—member initiated and derivative—differ in that, in a derivative action, the parties litigate whether demand was made or whether it was futile and, in a member initiated action, the parties litigate whether a given member's or manager's interest was adverse to the company. The plaintiff in the present case, however, was required to follow the procedure provided by statute in this jurisdiction at the time he filed his action. As such, the CLLCA required him to allege that he did not need to request a vote of Briner, whose interests were adverse to that of both companies.

Our interpretation regarding the mutual exclusivity of the two types of actions finds support in later versions of the Prototype Act and decisions by other legislatures that adopted the Prototype Act. In 2011, the Revised Prototype Limited Liability Company Act (Revised Prototype Act) was published by the Revised Prototype Limited Liability Company Act Editorial Board, Subcommittee on Limited Liability Companies, Partnerships and Unincorporated Entities of the Business Law Section of the American Bar Association. The Revised Prototype Act contains provisions permitting both the member initiated and derivative causes of action, derived from, inter alia, the Revised Model Business Corporation Act of 2007. See 3 L. Ribstein & R. Keatinge, Limited Liability Companies (Rev. Ed. 2019) Appendix G (noting that "[t]he original Prototype Act did not provide for derivative actions" but not explaining reasons for providing both remedies). Additionally, we observe that at least one other state that adopted the member initiated action from the Prototype Act chose to include, although absent from the Prototype Act itself, a separate provision permitting derivative actions. See

334 Conn. 135    DECEMBER, 2019    163

Saunders *v.* Briner

The plaintiff asks this court, however, to look past the CLLCA and conclude that, despite our legislature's omission of a derivative remedy in the CLLCA, limited liability company members and managers may sue derivatively under the common law.[29] We have recently

Ky. Rev. Stat. Ann. § 275.330 (LexisNexis 2012) (authorizing suit by or against limited liability company in its own name); Ky. Rev. Stat. Ann. § 275.335 (LexisNexis Supp. 2018) (providing for member initiated action authorizing members or managers to sue in name of company). But see Ky. Rev. Stat. Ann. § 275.337 (LexisNexis Supp. 2018) (providing members of limited liability companies with derivative remedy).

[29] The plaintiff relies on state trial court and federal District Court cases to claim that Connecticut courts have recognized a common-law derivative action for limited liability company members. Those decisions, however, are not binding on our court. Moreover, we are not persuaded by the reasoning in those cases, as the standing challenges in those cases chiefly contemplate a member's ability to bring direct, not derivative, causes of action. See, e.g., *Channing Real Estate, LLC* v. *Gates*, 326 Conn. 123, 138, 161 A.3d 1227 (2017) (limited liability company member lacked standing to bring direct claim because company was party directly harmed); *Scarfo* v. *Snow*, supra, 168 Conn. App. 497 (same); *O'Reilly* v. *Valletta*, 139 Conn. App. 208, 214–15, 55 A.3d 583 (2012) (same), cert. denied, 308 Conn. 914, 61 A.3d 1101 (2013).

The most compelling case, *Ward* v. *Gamble*, Docket No. CV-08-5017829-S, 2009 WL 2781541 (Conn. Super. July 23, 2009), in which the trial court contemplated whether the plaintiff in that case could maintain a *direct* action against the other members of the limited liability company, directly addressed whether our common law provides members of limited liability companies with a derivative cause of action. Id., *3–4. In concluding that the plaintiff could not bring a *direct* action to remedy alleged harm *to the company*, the trial court noted that he had to bring those claims as a derivative action on behalf of the company. Id.

In reaching that conclusion, however, the trial court recognized that "there is no appellate authority in Connecticut directly addressing the applicability of derivative actions to [limited liability companies]" but, nonetheless, concluded that derivative actions are available to limited liability company members because the decision of "the Appellate Court in *Wasko* [v. *Farley*, 108 Conn. App. 156, 947 A.2d 978, cert. denied, 289 Conn. 922, 958 A.2d 155 (2008)] . . . supports [the] conclusion" that, "[if] . . . a member may not sue individually for an injury to the [limited liability company] . . . [then] the need for a derivative action is virtually self-evident." (Footnote omitted; internal quotation marks omitted.) *Ward* v. *Gamble*, supra, 2009 WL 2781541, *4. Because, as we have explained in this opinion, the CLLCA provided members with the member initiated action, an alternative standing proposition, in which members could collectively bring suit in the company's name, we disagree with the reasoning in *Ward*. In addition, for the same reasons,

Saunders *v.* Briner

explained, however, that "[o]ur common law does not recognize [limited liability companies], which were first created by [the enactment of the CLLCA]." *Styslinger* v. *Brewster Park, LLC*, supra, 321 Conn. 317. The question we must resolve, therefore, is "whether the recognition of [this] common-law remedy would conflict with or frustrate the purpose of the [CLLCA] . . . ." (Internal quotation marks omitted.) *Caciopoli* v. *Lebowitz*, 309 Conn. 62, 69, 68 A.3d 1150 (2013). For the reasons we have already explained, we conclude that it would. Consistent with our reasoning, we observe that other Prototype Act jurisdictions have held that members and managers of limited liability companies must follow the procedure for bringing a member initiated action and, as such, lack standing to bring derivative actions under the common law. See, e.g., *Marx* v. *Morris*, 386 Wis. 2d 122, 148, 925 N.W.2d 112 (2019) (declining to "judicially import . . . corporate derivative standing provisions into the [limited liability company] context where the legislature has not done so").[30] Consequently, we conclude that the trial court improperly exercised subject matter jurisdiction over the plaintiff's claims on behalf of Revere Investments and Fund GP.

B

Direct Standing

We next address whether the trial court incorrectly determined that the plaintiff had standing to bring direct

_____

we decline to adopt the reasoning in *Beckworth* v. *Bizer*, 138 F. Supp. 3d 144 (D. Conn. 2015), in which the United States District Court for the District of Connecticut relied on *Ward*. Id., 157.

[30] But see *In re Patel*, 536 B.R. 1, 16 (Bankr. D.N.M. 2015) ("The fact that [New Mexico's member initiated action section] does not address whether a claim is direct or derivative does not mean the legislature intended to dispense with long-standing [common-law] principles governing shareholder/member derivative actions. . . . The [c]ourt will therefore apply principles of common law governing corporations—and in particular New Mexico law—to determine whether [the plaintiffs'] claims [were] direct or derivative." [Citation omitted.]).

Saunders *v.* Briner

claims alleging breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing against Briner and Revere Capital TX for failure to repay one of his loans, the LR Global bridge loan. The defendants claim that, because Saunders Capital made the investment at issue, the plaintiff lacked standing to bring a direct claim seeking repayment, as he lacked a distinct and separate injury from the company. According to the defendants, therefore, we should reverse the trial court's judgment as to those claims because the plaintiff was required to bring the action on behalf of Saunders Capital.[31] The plaintiff acknowledges the general rule prohibiting a member of a limited liability company from bringing a direct action when seeking to recover for a harm suffered by the company. He argues, however, that the general rule should not apply because he financed the loan with his personal capital through his wholly owned company. The plaintiff, therefore, asks this court to conclude that he satisfies the requirements for direct standing regardless of his use of Saunders Capital as a conduit. We conclude that, in the present case, the trial court correctly concluded that the plaintiff had standing to bring direct claims with respect to the LR Global bridge loan.

The record reveals the following additional facts that are relevant to our resolution of this claim. In connection with one particular loan made by Revere Investments to LR Global, the plaintiff loaned Revere Investments, through his single-member, solely owned

[31] The defendants claim that the plaintiff would have had to bring a *derivative* action on behalf of Saunders Capital. Because this court concludes, however, that our legislature did not provide for and our common law did not recognize a derivative cause of action for limited liability companies at the time the plaintiff filed his action, we observe that, were this court to conclude that the plaintiff lacked direct standing, the proper procedure for bringing an action on behalf of Saunders Capital under the CLLCA would have been for the plaintiff to bring an action in the name of Saunders Capital under § 34-187.

Saunders *v.* Briner

company, Saunders Capital, $398,000 of bridge financing. Saunders Capital appears on the spreadsheets for these loans as the provider of the bridge capital.[32] Although other investors eventually participated in the loan to LR Global, the plaintiff later converted a portion of his bridge capital, the amount of which was disputed at trial, into a permanent investment. After the parties began winding down the companies, however, the plaintiff learned that Briner, whom he had "entrusted . . . to perform [Revere Investments'] 'back office' duties," failed to repay him the remainder of the amount he initially funded.

In direct counts four, six, nine, and ten, and derivative counts seven and eight of his second amended complaint, the plaintiff claimed, inter alia, that Briner and Revere Capital TX breached their fiduciary duty and the implied covenant of good faith and fair dealing by failing to repay the remainder owed to the plaintiff on his LR Global bridge loan. In their posttrial brief, the defendants claimed, for the first time, that the plaintiff lacked standing to seek damages with respect to the LR Global bridge loan because Saunders Capital provided the funding. Although the trial court did not address the defendants' argument in its memorandum of decision, it rendered judgment in favor of the plaintiff with respect to the aforementioned counts, finding that Briner had failed to repay the plaintiff $55,000 of his bridge loan and, after including accrued interest, awarded him a total of $85,078.

On appeal, the defendants claim that the trial court improperly exercised subject matter jurisdiction over

---

[32] The defendants suggest that some investments made by the plaintiff originated from the plaintiff's pension plan. We observe that the defendants do not directly state that the loans at issue in this appeal came from the plaintiff's pension plan, and the record does not suggest it. Accordingly, we confine our discussion to whether the plaintiff could assert direct claims to recover the outstanding bridge capital even though the investment funds came from his limited liability company and not directly from him.

Saunders *v.* Briner

the plaintiff's direct claims for breach of fiduciary duty and the implied covenant of good faith and fair dealing with respect to the LR Global bridge loan. The defendants cite to our decision in *Channing Real Estate, LLC* v. *Gates*, 326 Conn. 123, 138, 161 A.3d 1227 (2017), in which this court held that members of limited liability companies cannot bring direct actions to recover for injuries suffered by the company. The plaintiff responds that our rule in *Channing Real Estate, LLC*, does not apply to this case because, as the sole member and owner of his company, he had exclusive authority[33] to "withdraw and use [personally owned capital]."[34] The question presented, therefore, is whether to exempt single-member limited liability companies from the direct and separate injury requirements necessary to bring a direct action. We conclude that, when the unique circumstance arises in which the sole member of a limited liability company seeks to remedy a harm suffered by it, a trial court may permit such a member to bring his claims in a direct action, as long as doing so does not implicate the policy justifications that underlie the distinct and separate injury requirement.

We begin with the general principles governing classical aggrievement. Although the question of whether the plaintiff lacked derivative standing concerned the CLLCA—which provided a substitute to the derivative remedy—and, therefore, implicated statutory aggrievement principles, the plaintiff does not assert that § 34-187 authorized him to bring his direct claims.

_____

[33] The record reveals that, before trial and at trial, the parties did not dispute that the capital loaned by the plaintiff was personally owned by him.

[34] The plaintiff further argues "that the defendants' multiple admissions of liability for the LR Global [bridge] loan" amount to a judicial admission that should afford him standing. We observe, however, that an admission that the plaintiff was personally injured does not resolve the issue of whether he "sustain[ed] a loss [that was] separate and distinct from that of" Saunders Capital. *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 282, 422 A.2d 311 (1979).

168 DECEMBER, 2019 334 Conn. 135

Saunders *v.* Briner

''The fundamental test . . . [therefore is] twofold
. . . . [F]irst, the party claiming aggrievement must
successfully demonstrate a specific, personal and legal
interest in [the subject matter of the challenged action],
as distinguished from a general interest, such as is the
concern of all members of the community as a whole.
Second, the party claiming aggrievement must success-
fully establish that this specific personal and legal inter-
est has been specially and injuriously affected by the
[challenged action].'' (Internal quotation marks omit-
ted.) *Wilcox* v. *Webster Ins.*, *Inc.*, 294 Conn. 206, 214–15,
982 A.2d 1053 (2009).

This court has not addressed the specific question of
whether the member of a single-member limited liability
company has standing to bring an action directly on
behalf of the company. We derived the general rule
outlined in *Channing Real Estate*, *LLC*—that members
of limited liability companies cannot bring a direct
action alleging harm to the company—from the direct
injury requirements imposed on shareholders.[35] Con-
sequently, the rationale behind the distinct and sepa-
rate injury requirement as explained in the corporate
law context provides an informative backdrop. We
explained in *Channing Real Estate*, *LLC*, that ''[a] dis-
tinction must be made between the right of a share-
holder to bring suit in an individual capacity as the sole
party injured, and his right to sue . . . on behalf of
the corporation alleged to be injured.'' *Yanow* v. *Teal
Industries*, *Inc.*, 178 Conn. 262, 281, 422 A.2d 311 (1979).
The distinction between a direct and derivative action

_____

[35] Our conclusion in *Channing Real Estate*, *LLC*, reflects the well estab-
lished corporate law principle that a shareholder must bring a derivative,
rather than a direct, action to seek redress for injuries to the corporation.
See, e.g., *Yanow* v. *Teal Industries*, *Inc.*, 178 Conn. 262, 281, 422 A.2d 311
(1979) (''a claim of injury, the basis of which is a wrong to the corporation,
must be brought in a derivative suit, with the plaintiff proceeding 'second-
arily,' deriving his rights from the corporation which is alleged to have
been wronged'').

turns on whether the alleged "injury sustained . . . is peculiar to [that shareholder] alone" or whether, by virtue of harm suffered by the company, it affects all of the shareholders collectively. Id., 282 n.9. In the latter situation, the plaintiff must proceed " 'secondarily,' deriving his rights from the corporation which is alleged to have been wronged." Id., 281.

We observe that the rule prohibiting shareholders from bringing a direct action to recover for a harm suffered by the corporation addresses the following policy rationales: (1) the protection of other shareholders and creditors of the company; (2) the avoidance of multitudinous litigation; and (3) the equal distribution of recovery to injured parties. See, e.g., *Barth* v. *Barth*, 659 N.E.2d 559, 561 (Ind. 1995). The American Law Institute explains that, if a shareholder sues directly for a harm that impacts multiple shareholders, the "injured shareholders other than the plaintiff will [not] share in the [plaintiff's] recovery [unless] the action is [brought as] a class action . . . on behalf of all [of] these shareholders." 2 A.L.I., Principles of Corporate Governance: Analysis and Recommendations (1994) § 7.01, comment (d), p. 20. Likewise, a plaintiff's direct action can prevent creditors of the corporation from sharing in any recovery. Id.; see also *May* v. *Coffey*, 291 Conn. 106, 119 n.9, 967 A.2d 495 (2009) (noting, in dictum, that allowing minority shareholders to bring direct action for majority's dilution of preexisting shares "would encourage . . . multiple lawsuits"). Consequently, a direct action alleging harm to multiple shareholders can "unfairly expose the corporation or the defendants to a multiplicity of actions" by shareholders or creditors that later bring claims and affect the ability of those later plaintiffs to receive "a fair distribution of the recovery . . . ." 2 A.L.I., supra, § 7.01 (d), p. 17.

An action brought by one shareholder on behalf of the company or derivative action, by contrast, alleviates

Saunders *v.* Briner

the concerns posed by the direct action. It "distributes the recovery more broadly and evenly than a direct action . . . [because it] goes to the corporation, [allowing] creditors and others having a stake in the corporation [to] benefit financially from [it] . . . ." Id., § 7.01, comment (d), p. 20. Similarly, because the corporation's recovery will be distributed to other shareholders, "[that derivative] action will have a preclusive effect that spares the corporation and the defendants from being exposed to a multiplicity of suits." Id. Courts, therefore, can protect the interest of other shareholders and creditors of the corporation, avoid a multiplicity of actions, and distribute equal recovery to all the injured parties by requiring shareholders to bring an action on behalf of the corporation.

The law, however, has recognized some exceptions to this corporate rule. The United States Court of Appeals for the Ninth Circuit, for example, recognized that, in some circumstances, the policy reasons for requiring shareholders to bring an action on behalf of the corporation may not be present even though the action alleges in substance a corporate injury. *Watson* v. *Button*, 235 F.2d 235, 237 (9th Cir. 1956); see id. (concluding that Oregon law would permit individual recovery by shareholders, although injury belonged to corporation, where rights of creditors and other shareholders are not prejudiced and there exists no threat of multiplicity of actions); see also 2 A.L.I., supra, § 7.01, comment (e), p. 21, citing *Watson* v. *Button*, supra, 237. Partly in response to *Watson*, the American Law Institute promulgated a rule for actions brought by members of closely held corporations that permits trial courts to treat the shareholders' otherwise indirect claims as direct claims.[36] See 2 A.L.I., supra, § 7.01 (d),

---

[36] We recognize that the commentary to § 1102 of the Prototype Act rejected a wholesale adoption of 2 A.L.I., supra, § 7.01 (d), as part of the general rule. See 3 L. Ribstein & R. Keatinge, supra, pp. App. C-111 through App. C-112. The commentary also acknowledged, however, that, when it comes to closely held corporations, there may be little difference between

Saunders *v.* Briner

p. 17. According to the American Law Institute, before a trial court can ''treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, it [must first find] that to do so will not (i) unfairly expose the corporation or defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.''[37] Id.

Following the American Law Institute's rationale, courts from other jurisdictions[38] have adopted excep-

---

direct and derivative claims, and recognized that ''[c]ourts may permit claims that essentially seek redress on behalf of the firm to be brought directly.'' Id., p. App. C-111. Thus, the commentary contemplated exceptions to the general rule that would allow, under certain narrow circumstances such as those in the present case, a member to bring direct claims on behalf of the LLC.

[37] We disagree with the dissent's suggestion that, by looking to *Watson* v. *Button*, supra, 235 F.2d 235, and the American Law Institute for guidance, our decision implicates the concerns this court expressed in *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 148–49, 84 A.3d 840 (2014). In the present case, this court did not raise the issue sua sponte. The plaintiff has raised the issue of whether he has direct standing to sue in light of his status as the sole owner and member of the company. In resolving that issue, which has been presented to the court, we are not limited to the authorities relied on by the parties. We therefore disagree with the dissent that it is necessary to seek further briefing from the parties in order to resolve the issue.

[38] We recognize that this court declined to adopt the American Law Institute's exception in the corporate law context in *Fink* v. *Golenbock*, 238 Conn. 183, 202–203, 680 A.2d 1243 (1996), and *May* v. *Coffey*, supra, 291 Conn. 111, 120–22. Those cases, however, are distinguishable from the present case. In *Fink*, a 50 percent shareholder filed suit against the other 50 percent shareholder and an employee of the shareholders' pediatric practice, alleging that the defendants violated, inter alia, CUTPA. *Fink* v. *Golenbock*, supra, 185–86. The trial court rendered judgment for the plaintiff, and the defendants appealed, claiming that the plaintiff lacked standing to bring his CUTPA claims derivatively. Id., 211–13. On appeal, this court affirmed the trial court's judgment on the ground ''that the plaintiff's derivative action was proper'' and, therefore, did not reach the issue of whether the plaintiff could have brought a direct action. Id., 198, 200. This court recognized in *Fink*, however, that ''there may be some instances in which the facts of a case give rise

Saunders *v.* Briner

either to a direct or to a derivative action—such as when an act affects both the relationship of a particular shareholder to the corporation and the structure of the corporation itself, causing or threatening injury to the corporation.'' Id., 202.

In *May*, minority shareholders of Latex Foam International Holdings, Inc. (Latex), alleged that the majority shareholders of Latex set the price of shares during a multiphase stock offering ''too low, resulting in the dilution of the plaintiffs' percentage ownership in the company.'' *May* v. *Coffey*, supra, 291 Conn. 110–11. This court concluded that the facts presented in *May* did not ''allow for the [trial] court to exercise . . . discretion'' in permitting the plaintiffs to bring their claims in a direct action, because—regardless of whether Latex constituted a closely held corporation—the harm was suffered by all the shareholders collectively, and, as such, the plaintiffs could not allege a separate and distinct injury. Id., 119–20; cf. *Wilcox* v. *Webster Ins.*, *Inc.*, supra, 294 Conn. 216–21 (members of limited liability company sufficiently alleged standing because their allegations that they were insureds under limited liability company's insurance policy demonstrated individual interests sufficient to challenge recovery under those policies). We reasoned, therefore, that the facts in *May* did not rise to the type of dual standing contemplated in *Fink. May* v. *Coffey*, supra, 120. We observe, however, that, even under § 7.01 (d) of the Principles of Corporate Governance, the plaintiff shareholders in *May* would lack standing because the fact that all of the shareholders suffered harm would lead to a risk of a multiplicity of suits and uneven distribution of recovery. See, e.g., *Trieweiler* v. *Sears*, 268 Neb. 952, 982, 689 N.W.2d 807 (2004). In the present case, by contrast, the ''fraud affecting [the plaintiff] . . . does not fall alike upon other shareholders''; id., 982; because none exists.

Additionally, we observe that the question before us differs from the questions presented to this court in *May* and *Fink*. Unlike in those cases—in which we contemplated whether the plaintiffs sustained an injury that was sufficiently separate and distinct from the other shareholders of the same corporation in order to allow them to bring their claims in a direct action—in the present case, we are not presented with whether, through Briner's failure to repay the plaintiff's LR Global bridge loan, the plaintiff sustained an injury sufficiently separate and distinct from that of Briner, the other 50 percent shareholder of Revere Investments but, *rather*, whether the plaintiff suffered an injury separate and distinct from Saunders Capital, which provided the bridge funding at issue, in order to justify bringing a direct action for harm suffered by that company.

We additionally acknowledge that, in *May*, we quoted *Smith* v. *Snyder*, 267 Conn. 456, 461, 839 A.2d 589 (2004), in which we alluded to the principle that even a sole shareholder lacks standing to assert claims alleging wrongs to the corporation. See *May* v. *Coffey*, supra, 291 Conn. 115. We observe, however, that these cases are distinguishable because neither of them involved limited liability companies or sole shareholders. The question presented in this appeal, therefore, is one of first impression. We observe, additionally, that the question remains one of first impression, notwithstanding decisions on the subject by the Appellate Court. We recognize that the Appellate Court did not allow a sole member of a limited liability company to bring a direct action alleging breach of contract arising out of the failed

Saunders *v.* Briner

tions permitting trial courts to treat otherwise deriva-
tive claims in a direct action where the plaintiff
shareholder belongs to a closely held corporation. See,
e.g., *Trieweiler* v. *Sears*, 268 Neb. 952, 983, 689 N.W.2d
807 (2004) ("the concept of a corporate injury that is
distinct from any injury to the shareholders approaches
the fictional in the case of a firm with only a handful
of shareholders"); *Durham* v. *Durham*, 151 N.H. 757,
762, 871 A.2d 41 (2005) ("[T]he derivative/direct distinc-
tion makes little sense when the only interested parties
are two individuals or sets of shareholders, one who is
in control and the other who is not. In this context,
the debate over derivative status can become purely
technical. . . . In cases . . . [in which] the principles
underlying the derivative proceeding are not served,
the trial court [may] allow the plaintiff to pursue a direct
claim against the corporate officers." [Citation omitted;
internal quotation marks omitted.]); *Aurora Credit Ser-
vices, Inc.* v. *Liberty West Development, Inc.*, 970 P.2d
1273, 1280 (Utah 1998) (permitting minority "[s]hare-
holders in a closely held corporation [to] bring directly
claims which are by nature derivative"); see also
*Thomas* v. *Dickson*, 250 Ga. 772, 774–75, 301 S.E.2d
49 (1983) (holding that derivative action was properly
maintained as direct action where factors outlined in
*Watson* v. *Button*, supra, 235 F.2d 237, were not impli-
cated); *Barth* v. *Barth*, supra, 659 N.E.2d 562 (adopting
American Law Institute approach); *Mynatt* v. *Collis*, 274
Kan. 850, 872–73, 57 P.3d 513 (2002) (adopting American
Law Institute approach); *Derouen* v. *Murray*, 604 So.
2d 1086, 1091 n.2 (Miss. 1992) (approving of American
Law Institute approach in dictum); R. Thompson, "The
Shareholder's Cause of Action for Oppression," 48 Bus.

sale of a limited liability company to the defendant; see *Padawer* v. *Yur*,
142 Conn. App. 812, 813–15, 66 A.3d 931, cert. denied, 310 Conn. 927, 78
A.3d 145 (2013); however, there was no indication in *Padawer* that the
Appellate Court considered the American Law Institute principles we
adopt today.

Saunders *v.* Briner

Law. 699, 735 (1993) (noting that "[a] growing number of courts . . . [have] permit[ed] direct suits in close corporation settings where the complaint is one that, in a public corporation setting, must be brought as a derivative action"). At least one other jurisdiction has extended this concept to limited liability companies. See *Dalton* v. *McLarty*, 671 Fed. Appx. 247, 248 (5th Cir. 2016) (citing corporate law case recognizing exception and anticipating that Mississippi law would allow direct action by member of limited liability company); see also S. Miller, "What Buy-Out Rights, Fiduciary Duties, and Dissolution Remedies Should Apply in the Case of the Minority Owner of a Limited Liability Company?," 38 Harv. J. on Legis. 413, 453 (2001) ("Because of the closely held nature of the [limited liability company], there may be little practical difference between a direct suit and a derivative suit. Therefore, the [American Law Institute's] analysis of derivative and direct suits with respect to close corporations may well apply to privately owned [limited liability companies].").

These authorities persuade us that, in cases such as this one, a narrowly tailored exception can provide a more flexible mechanism for addressing member standing.[39] This is especially true under circumstances, like those in the present case, in which both the parties and the court system expended time and resources to litigate these matters and the "concept of a corporate injury that is distinct from any injury to [its sole member] approaches the fictional . . . ." (Internal quotation marks omitted.) *Aurora Credit Services Inc.* v.

---

[39] We recognize that trial courts will apply this exception only in rare circumstances, such as those in the present case, in which neither party disputed that the plaintiff belongs to a single member limited liability company or that the capital he seeks to recover belonged to him personally. We observe that had the defendants raised this issue earlier, the plaintiff could have readily addressed and cured it by amending his complaint.

We also recognize the concerns articulated by jurisdictions that have declined to adopt a version of the closely held corporate exception. See 2 A.L.I., supra, § 7.01 (d), p. 17. Courts in those jurisdictions require sharehold-

Saunders *v.* Briner

*Liberty West Development, Inc.*, supra, 970 P.2d 1280.

ers to bring their claims derivatively on the basis of two main policy rationales. First, those courts articulate the goal of promoting the consistency
and predictability of corporate rules. See, e.g., *Simmons* v. *Miller*, 261
Va. 561, 575, 544 S.E.2d 666 (2001) (noting that corporate rules should be
predictable, "allowing . . . investors . . . to vary the rules by contract if
they think deviations are warranted" [internal quotation marks omitted]).
Similarly, the dissent suggests that the majority's approach undermines the
advantages of predictability and stability. As we explained, however, this
limited exception would apply in rare circumstances, under which the plaintiff would have been entitled to the same relief by a simple amendment to
the form of the pleading. There is no indication from the significant number
of jurisdictions that have adopted the exception that doing so has resulted
in corporate unpredictability or instability. See, e.g., *Trieweiler* v. *Sears*,
supra, 268 Neb. 983; *Durham* v. *Durham*, supra, 151 N.H. 762. Indeed as
the Supreme Court of New Hampshire noted, although "consistency in the
law is important . . . the derivative proceeding involves burdensome, and
often futile, procedural requirements . . . ." *Durham* v. *Durham*, supra,
762. This is especially true in a case such as this one, in which the parties
agreed that the bridge loan consisted of the plaintiff's money.

Second, courts rejecting the closely held corporation exception note that
individuals employing the corporate structure to enjoy limited liability
should not also be able to disregard that form to recover for corporate
losses. See, e.g., *Landstrom* v. *Shaver*, 561 N.W.2d 1, 14 (S.D. 1997) (The
court noted that the plaintiff sought "the best of both business entities:
limited liability provided by a corporate structure and direct compensation
for corporate losses. 'That cushy position is not one the law affords. Investors
who created the corporate form cannot rend the veil they wove.' "). Allowing
investors to disregard the corporate form in order to recover for corporate
losses owed to them individually, however, is consistent with our treatment
of corporate entities in other contexts. For example, our jurisdiction allows
trial courts to disregard the corporate form under circumstances in which
a creditor seeks to pierce the corporate veil and reach the assets of a sole
or majority shareholder who exercises such domination and control that
the corporation is considered to have "no separate . . . existence of its
own." *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187
Conn. 544, 553, 447 A.2d 406 (1982) (looking to control and domination over
corporation as factor in determining whether to pierce corporate veil);
see also Public Acts 2019, No. 19-181, §§ 1 and 2 (codifying traditional
veil piercing).

Further, there is no risk of double recovery by the shareholder and the
company, as this court has stated that, "[i]f the corporation is closely held,
in that one or a few persons hold substantially the entire ownership in it,
the judgment in an action by . . . the holder of ownership in it is conclusive
upon the [corporation] as to issues determined therein," and reasoning, in
part, that the "interests of the corporation's management and stockholders

Saunders *v.* Briner

Consequently, we conclude that the trial court may permit the member of a single-member limited liability company to bring an action raising derivative claims as a direct action and may order an individual recovery if it finds that to do so will not (1) unfairly expose the company or defendants to a multiplicity of actions, (2) materially prejudice the interests of creditors of the company, or (3) negatively impact other owners or creditors of the company by interfering with a fair distribution of the recovery among all interested parties.[40]

In the present case, the trial court properly exercised subject matter jurisdiction over the plaintiff's direct claims. Although the defendants did not challenge the plaintiff's standing to directly recover the remainder of his LR Global bridge loan until after the close of evidence in their posttrial brief, the trial court's exercise of jurisdiction implicitly relies on and is supported by

and the corporation itself generally fully coincide . . . [and, therefore] there is no good reason why a closely held corporation and its owners should be ordinarily regarded as legally distinct." (Internal quotation marks omitted.) *Joe's Pizza, Inc.* v. *Aetna Life & Casualty Co.*, 236 Conn. 863, 869, 675 A.2d 441 (1996).

[40] We observe that a majority of the jurisdictions that have adopted a version of the American Law Institute's provision, § 7.01 (d), have applied an abuse of discretion standard of review. See, e.g., *Barth* v. *Barth*, 693 N.E.2d 954, 957–58 (Ind. App. 1998) (reviewing, under abuse of discretion standard, trial court's dismissal of action after that state's Supreme Court had adopted American Law Institute's provision and remanded case to trial court to determine whether plaintiff met three factors); *Mynatt* v. *Collis*, supra, 274 Kan. 873 (noting that "[a] trial court's reason for its decision is immaterial if the ruling is correct for any reason" [internal quotation marks omitted]); *Mathis* v. *ERA Franchise Systems, Inc.*, 25 So. 3d 298, 302 (Miss. 2009) ("trial judge did not abuse his discretion in holding that [the plaintiff] could not pursue his derivative claims in a direct action"); *Schumacher* v. *Schumacher*, 469 N.W.2d 793, 799 (N.D. 1991) ("[t]he ultimate question is whether the trial court's refusal to allow [the plaintiffs] to bring a direct action constituted an abuse of the court's discretion"). But see *Trieweiler* v. *Sears*, supra, 268 Neb. 983–84 (applying de novo standard of review to facts of that case upon adoption of the American Law Institute's § 7.01 [d]). We follow the majority of cases and direct our appellate courts to review the trial court's application of the rule we adopt in part I B of this opinion under an abuse of discretion standard.

Saunders *v.* Briner

the three factors set forth by the American Law Institute. See 2 A.L.I., supra, § 7.01, p.17. The record reveals that, at trial, neither party disputed that the plaintiff constituted Saunders Capital's sole member or that he funded the bridge loan with his personal funds. The trial court explicitly found that the capital provided for that loan belonged to the plaintiff personally. Moreover, because neither the record nor either party suggests that any creditors of Saunders Capital exist and would be prejudiced by the plaintiff's recovery, we observe that the trial court's decision to permit the plaintiff to recover directly will not lead to a multiplicity of actions or interfere with a fair distribution of recovery with respect to other members or creditors. Under the circumstances, we believe that prohibiting the plaintiff, the sole member of Saunders Capital, from bringing a direct action ''would 'exalt form over substance' [because] . . . none of the reasons underlying the [distinct and separate injury] requirement [is] present.'' *Barth* v. *Barth*, supra, 659 N.E.2d 560.

II

REIMBURSEMENT FOR FEES AND COSTS

The final issue we resolve in this appeal concerns a prevailing party's ability to receive reimbursement for the work performed by a joint fiduciary appointed by the court to wind up the companies at issue in a dissolution proceeding. The plaintiff claims that the trial court abused its discretion in refusing to order Briner to reimburse him for fees incurred by Schachter in his capacity as the joint, court-appointed fiduciary and Nicholas Puglisi, an accountant engaged by Schachter to assist in winding up the Fund and Fund GP. The plaintiff argues that, because the trial court rendered judgment in his favor on counts four and six, and determined that Briner and Revere Capital TX breached their fiduciary duty and the implied covenant of good faith and

Saunders *v.* Briner

fair dealing in failing to repay the amount owed to the plaintiff on his LR Global bridge loan, the trial court should have either apportioned the fees or "[held] a hearing to apportion [the] fees" incurred by Schachter and Puglisi to the extent that the services performed were to correct tax and accounting errors caused by Briner's misconduct. The defendants respond that the trial court did not abuse its discretion in rejecting the plaintiff's request for reimbursement, as it properly determined that all of the owners of Revere Investments and Fund GP, including the plaintiff, bore responsibility for failing to ensure that the bookkeeping and accounting of those companies were properly performed. We conclude that the trial court did not abuse its discretion.

The following additional facts are relevant to our resolution of this issue. The trial court found that the plaintiff "trusted [Briner] to properly manage the daily operations of [Revere Investments], the Fund, and Fund GP and to service the loans to [his] expectations, but . . . failed to verify, or to hire competent help [to] verify, that [Briner] was managing and servicing [the loans] as expected and required . . . [even] when [Briner] increasingly complained about [a] disparate workload . . . ." "[E]ven after discovering [that Briner placed] his outside investor money in [Revere Capital CT] and [kept] the profits associated therewith from [Revere Investments] . . . neither [the plaintiff] nor [Saunders] exercised [his] powers in [the companies] to manage and supervise the investments and hire competent bookkeeping, tax, legal, and accounting experts to review [their] books and records . . . ."

Consequently, although the trial court determined that Briner and Revere Capital TX owed the plaintiff $85,078 in connection with failing to repay the LR Global bridge loan, it rejected the plaintiff's request to order the defendants to reimburse him for the fees incurred by Schachter and Puglisi, who analyzed "the complex payment structures" for errors and consulted on "tax

Saunders *v.* Briner

implications'' associated with winding down the companies. That court noted that ''[t]he cause of those fees was the bookkeeping and accounting that *all the owners and managers* were responsible [for] assur[ing] were correctly performed . . . [and] *all owners* failed to assure that appropriate bookkeeping and accounting were regularly performed and supervised.'' (Emphasis in original.)

We note at the outset of our analysis that, although the CLLCA contains a provision governing the ability of members and managers to wind up a company's affairs; General Statutes (Rev. to 2017) § 34-208; it does not provide guidance on reimbursement of fees incurred by receivers appointed to effectuate the winding up process. We begin, therefore, with the legal principles governing the review of a trial court's order awarding attorney's fees or other litigation expenses. We have explained that ''Connecticut adheres to the 'American rule' . . . [which reflects the idea that] in the absence of statutory or contractual authority to the contrary, a successful party is not entitled to recover attorney's fees or other 'ordinary expenses and burdens of litigation . . . .' '' *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 326, 63 A.3d 896 (2013). ''It is well established that we review the trial court's decision to award attorney's fees for abuse of discretion. . . . This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, '[w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did.' '' (Citations omit-

Saunders *v.* Briner

ted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265
Conn. 210, 252–53, 828 A.2d 64 (2003).

We conclude that the trial court did not abuse its
discretion in refusing to order the defendants to reim-
burse the plaintiff for the fees incurred by Schachter
and Puglisi. The trial court found that, in failing to ''hire
professional bookkeeping, tax and legal professionals
to assure that the management duties of [the compa-
nies] were properly performed . . . [and] [leaving
Briner] largely unsupervised,'' the plaintiff did not
timely protect his interests. On the basis of the trial
court's numerous findings, including the discrepancy
of experience between the parties, it was reasonable
for the trial court to determine that the plaintiff's neglect
contributed to the magnitude of complexity required for
Schachter and Puglisi to untangle Revere Investments'
books and records.[41] The trial court did not abuse its

---

[41] We therefore reject the plaintiff's claim that ''a party who has already
suffered injury by the tort of another is entitled to recover for expenditures
reasonably made or harm suffered in a reasonable effort to avert further
harm.'' (Internal quotation marks omitted.) Although, to support this claim,
the plaintiff states that he ''made every reasonable effort to avoid the expense
of a judicial dissolution and to amicably resolve the parties' issues,'' the
record reveals e-mails that paint the plaintiff in a less angelic light, such as
two e-mails that the plaintiff sent to Briner's outside investors, the first in
which he discussed the litigation and noted that ''Briner . . . may seek
. . . to prevent the dissemination of [Schachter's] report'' and a second, in
which he attached Schachter's report revealing Briner's misdealing, which
was against Schachter's express instructions that the parties not release the
report prior to his amending it.

Additionally, we reject the plaintiff's claim that the trial court's findings
were contradictory in that it found both that the defendants' misappropriated
and failed to adequately account for funds and also that all the parties were
responsible for ensuring proper bookkeeping and accounting. The trial court
explained that, although Briner inadequately ''perform[ed] the duties associ-
ated with operating'' Revere Investments, the Fund, and Fund GP, the plain-
tiff and Saunders failed to properly and adequately supervise Briner's
management of those companies.

Lastly, we reject the plaintiff's claim that Briner was solely responsible
for ensuring proper bookkeeping and accounting merely because the plaintiff
paid him 85 percent of the management fee to perform those tasks. The
trial court found that both Briner and the plaintiff, who were equal members

Saunders *v.* Briner

discretion in refusing to order Briner to reimburse the plaintiff for fees incurred by Schachter and Puglisi in winding up the Fund and Fund GP.

For the reasons set forth in this opinion, we conclude that, in the absence of a provision in the operating agreement of a limited liability company authorizing the filing of derivative lawsuits, members and managers lacked standing to bring derivative claims under the CLLCA and the common law at the time the plaintiff commenced the present action; although the general rule prohibits a derivative action, the trial court may, in its discretion, permit a member of a single-member limited liability company to bring an action raising derivative claims as a direct action and to order an individual recovery if the court finds that it will not (1) unfairly expose the company or defendants to a multiplicity of actions, (2) materially prejudice the interests of creditors of the company, or (3) interfere with a fair distribution of the recovery among all interested parties. We further conclude that the trial court did not abuse its discretion in refusing to order the defendants to reimburse the plaintiff for his portion of the fees incurred by the joint, court-appointed fiduciary and an

and comanagers, owed a fiduciary duty to the Fund. In fact, the trial court noted that ''[t]he fiduciary relationship is not singular. The relationship between sophisticated partners in a business venture may differ from the relationship involving lay people who are wholly dependent upon the expertise of a fiduciary. . . . *Falls Church Group LTD.* v. *Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 108, 912 A.2d 1019 (2007).'' (Internal quotation marks omitted.) The record reveals that the parties created '' 'a complex and arcane web of business entities' '' in a field in which the plaintiff benefited from expertise and Briner struggled from his inexperience. (Footnote omitted.) Additionally, Saunders—who entered the business with much more experience than Briner in Excel and Quickbooks—reviewed Briner's work and gave him feedback but failed to take further steps to prevent him from mismanaging and misallocating funds. We observe, therefore, that the record supports the trial court's finding that ''*all* [*the*] *owners* failed to assure that appropriate bookkeeping and accounting were regularly performed and supervised.'' (Emphasis in original.)

Saunders *v.* Briner

accountant hired by him. We therefore affirm the trial court's judgment rendered in favor of the plaintiff as to his direct claims, reverse the trial court's judgment in favor of the plaintiff as to his derivative claims, and vacate the trial court's order awarding the plaintiff attorney's fees and costs under CUTPA.

The judgment is reversed with respect to the plaintiff's derivative claims and the case is remanded with direction to vacate the order awarding attorney's fees to the plaintiff; the judgment is affirmed in all other respects.

In this opinion PALMER, D'AURIA and ECKER, Js., concurred.

ROBINSON, C. J., with whom McDONALD and MULLINS, Js., join, concurring in part and dissenting in part. I respectfully disagree with part I B of the majority opinion, which concludes that the plaintiff, Roger L. Saunders, had standing to bring counts four, six, nine and ten of the second amended complaint, asserting direct claims of breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing against the defendants Clark Briner and Revere Capital, LLC, a Texas limited liability company (LLC).[1] I conclude that the plaintiff lacks standing because the bridge loan to Revere Investments, LLC (Revere Investments), in connection with Revere Investments' loan to LR Global (LR Global bridge loan) that gave rise to these claims was made by Saunders Capital, LLC (Saunders Capital), which is an LLC of which the plaintiff was the sole member and manager, meaning that any injury was suffered by the LLC rather than the plaintiff person-

_____

[1] I do, however, agree with and join part I A of the majority opinion, which reverses the judgment of the trial court in favor of the plaintiff on his derivative claims. Because of my conclusions as to standing, I do not reach the reimbursement issues considered in part II of the majority opinion.

Saunders *v.* Briner

ally—even though it was the plaintiff who had provided the funds at issue to Saunders Capital.[2] In so concluding, I respectfully disagree with the majority's decision to follow § 7.01 (d) of the American Law Institute's Principles of Corporate Governance: Analysis and Recommendations (Principles of Corporate Governance) and adopt a single member LLC exception to the general rule prohibiting members of such companies from bringing direct actions to recover for harms suffered entirely by the company. See 2 A.L.I., Principles of Corporate Governance: Analysis and Recommendations (1994) § 7.01 (d), p. 17; see also, e.g., *Channing Real Estate, LLC* v. *Gates*, 326 Conn. 123, 138, 161 A.3d 1227 (2017). In my view, the majority's decision to adopt this single member exception to the general rule invades our legislature's primary role in the formulation of public policy—in an arena that is purely statutory. Additionally, the majority's approach may open the door to gamesmanship with the LLC corporate form. Because I conclude that the plaintiff lacked standing to bring counts four, six, nine and ten of the second amended complaint, I respectfully dissent from part I B of the majority opinion.

I agree at the outset with the majority's recitation of the facts and procedural history of this case. I also note that it is well settled that the "issue of standing implicates a court's subject matter jurisdiction and is subject to plenary review. . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining aggrievement encompasses a [well settled] twofold determination:

[2] I agree with the majority's rejection of the plaintiff's argument that the defendants' multiple admissions of liability for the LR Global bridge loan constituted judicial admissions that afforded him standing. I also agree with the majority's determination that the fact that the plaintiff suffered an injury did not resolve the standing question, which is predicated on whether his losses were separate and distinct from those suffered by Saunders Capital.

Saunders *v.* Briner

first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]." (Citation omitted; internal quotation marks omitted.) *Channing Real Estate, LLC* v. *Gates*, supra, 326 Conn. 137.

By way of background, I "begin . . . with the nature of LLCs and the law that governs them. Our common law does not recognize LLCs, which were first created by statute in Connecticut in 1993. Public Acts 1993, No. 93-267. An LLC is a distinct type of business entity that allows its owners to take advantage of the pass-through tax treatment afforded to partnerships while also providing them with limited liability protections common to corporations. See, e.g., 51 Am. Jur. 2d 818, Limited Liability Companies § 1 ([2d Ed.] 2011); see also General Statutes [Rev. to 2017] § 34-133 (setting forth members' limited liability protections). The [Connecticut Limited Liability Company Act, General Statutes (Rev. to 2017) § 34-100 et seq.] establishes the right to form an LLC and all of the rights and duties of the LLC, as well as all of the rights and duties of members and assignees. It permits the members to supplement these statutory provisions by adopting an operating agreement to govern the LLC's affairs. See, e.g., General Statutes [Rev. to 2017] § 34-140 (c) (permitting members to adopt operating agreement governing LLC's affairs, provided agreement is consistent with act)." *Styslinger* v. *Brewster Park, LLC*, 321 Conn. 312, 317–18, 138 A.3d 257 (2016); accord General Statutes § 34-243 et seq. (provisions of Connecticut Uniform Limited Liability Company Act, effective July 1, 2017).

Saunders *v.* Briner

In *Channing Real Estate, LLC*, we followed the decision of the Appellate Court in *O'Reilly* v. *Valletta*, 139 Conn. App. 208, 214, 55 A.3d 583 (2012), cert. denied, 308 Conn. 914, 61 A.3d 1101 (2013), and observed that an LLC "is a distinct legal entity whose existence is separate from its members. . . . [An LLC] has the power to sue or to be sued in its own name; see General Statutes [Rev. to 2017] §§ 34-124 (b) and 34-186; or may be a party to an action brought in its name by a member or manager. See General Statutes [Rev. to 2017] § 34-187.[3] A member or manager, however, may not sue in an individual capacity to recover for an injury based on a wrong to the [LLC]." (Footnote in original; internal quotation marks omitted.) *Channing Real Estate, LLC* v. *Gates*, supra, 326 Conn. 137–38; see also General Statutes (Rev. to 2017) § 34-134 ("[a] member or manager of a limited liability company is not a proper party to a proceeding by or against a limited liability company solely by reason of being a member or manager of the limited liability company"). In *Channing Real Estate, LLC*, we concluded that an individual defendant lacked standing to assert a counterclaim alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., against the plaintiff because the facts established that the defendant had "not demonstrated a specific, personal, and legal interest separate from that of Front Street Commons," an LLC of which he was a member. *Channing Real Estate, LLC* v. *Gates*, supra, 138. We explained that "Front Street Commons owned the property that was at issue during the parties' negotiations. Front Street Commons would have been a party to the proposed option and

_____

[3] "We note that §§ 34-124, 34-186 and 34-187 have been repealed, effective July 1, 2017. See Public Acts 2016, No. 16-97. We also note, however, that General Statutes § 34-243h (a), effective July 1, 2017, provides: 'A limited liability company has the capacity to sue and be sued in its own name and the power to do all things necessary or convenient to carry on its activities and affairs.' " *Channing Real Estate, LLC* v. *Gates*, supra, 326 Conn. 138 n.6.

Saunders *v.* Briner

operating agreements. Front Street Commons allegedly lost financial assistance from the plaintiff and suffered lost rental income. From these facts, it is clear that the injuries the defendant alleges in the CUTPA count of his counterclaim, if any, are those allegedly suffered by Front Street Commons specifically, and not the defendant. Front Street Commons is [an LLC] and is therefore a distinct legal entity from the defendant, who is simply a member of that entity. Because a member of [an LLC] cannot recover for an injury allegedly suffered by the [LLC], we conclude that the defendant lacks standing to pursue a claim alleging a violation of CUTPA.'' Id.; accord *Wilcox* v. *Webster Ins.*, *Inc.*, 294 Conn. 206, 219–20, 982 A.2d 1053 (2009) (concluding that General Statutes [Rev. to 2009] § 34-134 did not bar claims against insurance company by members of LLC to whom insurance policies had been issued because their status as named insureds under policies gives them standing).

Although this issue remains one of first impression for this court, I observe first that, in *Padawer* v. *Yur*, 142 Conn. App. 812, 818, 66 A.3d 931, cert. denied, 310 Conn. 927, 78 A.3d 145 (2013), our Appellate Court, consistent with the analysis in our subsequent decision in *Channing Real Estate*, *LLC*, held that a sole member of an LLC lacks standing to bring an action for harm suffered only by the LLC.[4] Courts in other jurisdictions,

___

[4] In *Padawer*, on which the defendants rely heavily, the Appellate Court followed, inter alia, General Statutes (Rev. to 2017) §§ 34-134 and 34-167 (a), and held that the plaintiff in that case, who was the sole member of an LLC, lacked standing to bring a breach of contract action because it was the LLC that was ''the contemplated party to the contract with the defendants, and . . . the assets intended to be transferred through the execution of that contract were assets belonging to the [LLC], rather than the plaintiff individually. If the defendants' alleged breach caused any harm, therefore, it was to [the] LLC, not to the plaintiff in his individual capacity. Although the plaintiff is the sole member of [the] LLC, that does not impute ownership of the [LLC's] assets to the plaintiff. . . . His position as sole member, also, does not provide him with standing to recover individually for harm to the [LLC].'' (Citation omitted.) *Padawer* v. *Yur*, supra, 142 Conn. App. 818.

334 Conn. 135　　DECEMBER, 2019　　187

Saunders *v.* Briner

with near uniformity, have held similarly to the Appellate Court in *Padawer*. See, e.g., *Direct List, LLC* v. *Kessler*, Docket No. 15-cv-2025-WQH-JLB, 2018 WL 3327802, *1–2 (S.D. Cal. July 6, 2018); *Home Title Co. of Maryland, Inc.* v. *LaSalla*, 257 So. 3d 640, 644–45 (Fla. App. 2018); *Turner* v. *Andrew*, 413 S.W.3d 272, 276 (Ky. 2013); *Zeigler* v. *Housing Authority*, 118 So. 3d 442, 450 (La. App. 2013); *Krueger* v. *Zeman Construction Co.*, 758 N.W.2d 881, 890 (Minn. App. 2008), aff'd, 781 N.W.2d 858 (Minn. 2010); *Freedom Financial Group, Inc.* v. *Woolley*, 280 Neb. 825, 834, 792 N.W.2d 134 (2010); *Sherman* v. *Boston*, 486 S.W.3d 88, 94–95 (Tex. App. 2016); *Woods View II, LLC* v. *Kitsap*, 188 Wn. App. 1, 23–24, 352 P.3d 807, review denied, 184 Wn. 2d 1015, 360 P.3d 818 (2015); accord *Elizabeth Retail Properties LLC* v. *KeyBank National Assn.*, 83 F. Supp. 3d 972, 987–88 (D. Or. 2015) (applying Oregon law and concluding that single member of LLC had standing because defamation and loss of business reputation claims caused injuries to her that went beyond those

Although the Appellate Court's opinion in *Padawer* did not address the Principles of Corporate Governance, on which the majority relies, *Padawer* has been considered to be Connecticut's presently controlling decision with respect to the standing of a sole LLC member. See, e.g., *Lundstedt* v. *People's United Bank*, Docket No. 3:14-cv-01479 (JAM), 2015 WL 540988, *2 (D. Conn. February 10, 2015) (following *Padawer* and concluding, with respect to claims of illegal overdraft charges, that "a person who transfers his or her assets to an LLC has no standing to seek damages when those assets—now belonging solely to the LLC—are harmed," even though plaintiff was "sole manager/member" of LLC); *Bongiorno* v. *Capone*, 185 Conn. App. 176, 201–202, 196 A.3d 1212 ("The company is [an LLC] and is, therefore, a distinct legal entity from the plaintiff, who is simply a member of that entity. Even after the plaintiff became the sole member of the company, the company remained a distinct legal entity. Because a member of [an LLC] cannot recover for an injury allegedly suffered by [such] company, we conclude that the plaintiff lacked standing to pursue a claim of statutory theft in this case."), cert. denied, 330 Conn. 943, 195 A.3d 1134 (2018); see also *Scarfo* v. *Snow*, 168 Conn. App. 482, 504, 146 A.3d 1006 (2016) (following *Padawer* in intracorporate dispute between LLC members). Accordingly, for the benefit of the bar and bench, I believe that the majority's decision in this case effectively overrules *Padawer* and the line of cases that follow it.

Saunders *v.* Briner

suffered by LLC). But see *Stoker* v. *Bellemeade, LLC*, 272 Ga. App. 817, 822, 615 S.E.2d 1 (2005) ("we find no reason to require the [plaintiffs] to derivatively assert the breach of fiduciary duty claims in the context of the closely held LLCs in the present case"), rev'd in part on other grounds, 280 Ga. 635, 631 S.E.2d 693 (2006); *Marx* v. *Morris*, 386 Wis. 2d 122, 148–49, 925 N.W.2d 112 (2019) ("[C]orporate principles of standing do not apply to LLCs. Specifically, in the matter before us, injuries to North Star [an LLC] and to its members are not mutually exclusive because financial injury to North Star flows through to its members just as an injury would if North Star were a partnership rather than an LLC. Therefore, the question is not whether the alleged injury is to the LLC or to its individual members. Rather, the question is simply whether the individual member bringing the action has suffered an injury to a legally protected interest."). A prominent, local scholarly commentator agrees, writing that "a member cannot sue in an individual capacity to recover for any injury based on a wrong to the LLC, even if the LLC has only one member." M. Ford, Connecticut Corporation Law and Practice (2d Ed. 2017 Supp.) § 13.03 (H), p. 13-20; see also 51 Am. Jur. 2d, supra, § 45, p. 894 ("[a] member of an [LLC] may not sue in an individual capacity to recover for an injury the basis of which is a wrong to the LLC").

The majority, however, adopts an exception to this well settled general rule that is premised on § 7.01 (d) of the American Law Institute's Principles of Corporate Governance, which blurs the line between derivative and direct actions in certain cases involving closely held corporations.[5] Section 7.01 (d) allows a trial court

---

[5] We summarized our case law articulating the distinction between direct and derivative actions in *May* v. *Coffey*, 291 Conn. 106, 967 A.2d 495 (2009), observing that: "In *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 281–82, 422 A.2d 311 (1979), we stated that [a] distinction must be made between the right of a shareholder to bring suit in an individual capacity as the sole party injured, and his right to sue derivatively on behalf of the corporation

to "treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses

alleged to be injured. . . . Generally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered their stock of less value, since the injury is generally not to the shareholder individually, but to the corporation—to the shareholders collectively. . . . In this regard, it is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding secondarily, deriving his rights from the corporation which is alleged to have been wronged. . . . It is, however, well settled that if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly, the cause of action is personal and individual. . . . In such a case, the plaintiff-shareholder sustains a loss separate and distinct from that of the corporation, or from that of other shareholders, and thus has the right to seek redress in a personal capacity for a wrong done to him individually. . . . Thus, where an injury sustained to a shareholder's stock is peculiar to him alone, and does not fall alike upon other stockholders, the shareholder has an individual cause of action. . . .

"Subsequently, in *Smith* v. *Snyder*, [267 Conn. 456, 461, 839 A.2d 589 (2004)], we reaffirmed the general rule that [i]n order for a shareholder to bring a direct or personal action against the corporation or other shareholders, that shareholder must show an injury that is separate and distinct from that suffered by any other shareholder or by the corporation. . . . [A] shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation." (Citations omitted; internal quotation marks omitted.) *May* v. *Coffey*, supra, 291 Conn. 114–15; see also *Fink* v. *Golenbock*, 238 Conn. 183, 200–202, 680 A.2d 1243 (1996) (describing shareholder derivative action procedure under General Statutes § 52-572j).

I note that the legislature has specifically recognized this distinction in the new Connecticut Uniform Limited Liability Company Act, which provides LLC members with the right to bring a direct action but requires the pleading and proof of "an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." General Statutes § 34-271 (b).

An example of a separate and distinct injury giving rise to direct standing to sue in the intracorporate LLC context is described in the Appellate Court's opinion in the companion case, *Wiederman* v. *Halpert*, 178 Conn. App. 783, 796–98, 176 A.3d 1242 (2017), appeal dismissed, 334 Conn. 199, A.3d (2019), in which the defendants were alleged to have misappropriated and converted funds invested by the plaintiff, who was induced to become a 50 percent member in their real estate development LLC. See also *Scarfo* v. *Snow*, 168 Conn. App. 482, 504, 146 A.3d 1006 (2016) (following *Padawer* and concluding that plaintiff lacked standing to bring action against only other member of LLC alleging mismanagement of project because, "if there was an injury, that injury was sustained by [the LLC] and then sustained by the plaintiff [and] [t]hus, the plaintiff's injury is not direct, and he has no standing to sue in his individual capacity").

Saunders *v.* Briner

applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons."[6] Principles of Corporate Governance, supra, § 7.01 (d), p. 17. The commentary explains that § 7.01 (d) is premised on the decision of the United States Court of Appeals for the Ninth Circuit in *Watson* v. *Button*, 235 F.2d 235 (9th Cir. 1956), "which found that the usual policy reasons requiring an action that principally alleges an injury to the corporation to be treated as a derivative action are not always applicable to the closely held corporation." Principles of Corporate Governance, supra, § 7.01, comment (e), p. 21; see *Watson* v. *Button*, supra, 237 (Under Oregon law, "[s]uits against directors for violations of fiduciary duties are equitable in nature," and the plaintiff could seek permission to proceed directly because he and the defendant "were the only stockholders at the time of the misappropriation. The corporate creditors are adequately protected since [the two parties] are jointly responsible for the corporate liabilities.").

In adopting this principle, the American Law Institute also found persuasive the Massachusetts Supreme Judicial Court's decision in *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505 (1975), which had observed that "the close corporation bears striking resemblance to a partnership," and that "the close corporation is often little more than an 'incor-

_____

[6] Consistent with part I A of the majority opinion, I recognize that the plaintiff's statutory alternative to a derivative action, which we do not recognize in the LLC context as a matter of statutory or common law, was a member initiated action pursuant to General Statutes (Rev. to 2017) § 34-187. But see General Statutes § 34-271a et seq. (provisions of Connecticut Uniform Limited Liability Company Act, effective July 1, 2017, providing statutory right to derivative action).

porated' or 'chartered' partnership''; id., 586; in holding
that stockholders in a close corporation owe each other
a fiduciary duty akin to that of partners. Id., 592–93;
see Principles of Corporate Governance, supra, § 7.01,
comment (e), pp. 21–23. The American Law Institute
considered that particular context and observed that,
''[i]n some circumstances, characterizing the action as
direct will also be fairer to the defendants, as when
the defendants wish to file a counterclaim against the
plaintiff, because the general rule is to prohibit counter-
claims in a derivative action. . . . Also, in a direct
action, each side must normally bear its own legal
expenses, and the plaintiff, if successful, cannot ordi-
narily look to the corporation for attorney's fees. Such
a rule seems more appropriate in cases that funda-
mentally involve disputes between a limited number of
'partners' in a closely held firm.'' (Citation omitted.)
Principles of Corporate Governance, supra, § 7.01, com-
ment (e), p. 22.

I respectfully disagree with the majority's decision
to adopt the *Watson* v. *Button*/American Law Institute
approach to close corporation standing to hold that
the plaintiff had standing to raise the claims alleged in
counts four, six, nine and ten of the second amended
complaint.[7] First, I do not believe that approach applies
at all with respect to the factual predicate underlying
those counts because it ''is almost always employed in

---

[7] I acknowledge that, as the majority observes, multiple courts have
adopted the *Watson* v. *Button*/American Law Institute approach to close
corporation standing, both before and after its endorsement by the American
Law Institute. See, e.g., *Thomas* v. *Dickson*, 250 Ga. 772, 774, 301 S.E.2d 49
(1983); *Steelman* v. *Mallory*, 110 Idaho 510, 513, 716 P.2d 1282 (1986); *Barth*
v. *Barth*, 659 N.E.2d 559, 562 (Ind. 1995); *Mynatt* v. *Collis*, 274 Kan. 850,
872–73, 57 P.3d 513 (2002); *Trieweiler* v. *Sears*, 268 Neb. 952, 983, 689 N.W.2d
807 (2004); *Durham* v. *Durham*, 151 N.H. 757, 763, 871 A.2d 41 (2005);
*Crosby* v. *Beam*, 47 Ohio. St. 3d 105, 109–10, 548 N.E.2d 217 (1989); *Aurora
Credit Services, Inc.* v. *Liberty West Development, Inc.*, 970 P.2d 1273,
1280–81 (Utah 1998); see also *Derouen* v. *Murray*, 604 So. 2d 1086, 1091
n.2 (Miss. 1992) (approving of approach in dicta).

192 DECEMBER, 2019 334 Conn. 135

Saunders *v.* Briner

purely intracorporate disputes.'' *Mathis* v. *ERA Franchise Systems, Inc.*, 25 So. 3d 298, 302 (Miss. 2009); see id., 301–302 (declining to apply doctrine when plaintiff's action was ''filed against his current and former business partners'' and ''four defendants who are not and have never been owners or members'' of business at issue, creating potential for multiplicity of actions and interference with distribution of recovery). As the majority acknowledges in footnote 38 of its opinion, distinguishing our decisions in *May* v. *Coffey*, 291 Conn. 106, 967 A.2d 495 (2009), and *Fink* v. *Golenbock*, 238 Conn. 183, 680 A.2d 1243 (1996), the counts considered in part I B of the majority opinion do not present an intracorporate dispute, insofar as we consider whether the plaintiff sustained an injury separate and distinct from his own LLC, Saunders Capital, rather than one distinct from the other members of Revere Investments and Revere High Yield, GP, LLC (Fund GP).[8] Rather than presenting an occasion to make significant changes to corporate law in Connecticut, I believe that the present case is nothing more than a simple ''wrong plaintiff'' case—which might well explain why the plaintiff did not attempt to rely on the *Watson* v. *Button*/American Law Institute approach in his brief and why the defendants' reply brief simply reiterates their reliance on *Padawer* v. *Yur*, supra, 142 Conn. App. 817–18.[9]

[8] As I understand the authorities that embrace the *Watson* v. *Button*/ American Law Institute approach, this doctrine would potentially apply to save a direct action that should have been brought derivatively in the manner contemplated in part I A of the majority opinion, namely, by the plaintiff to protect his interests that derive from his 50 percent membership in Revere Investments and Fund GP. See also footnotes 5 and 6 of this dissenting opinion.

[9] I also note my prudential concerns about the process that resulted in part I B of the majority opinion. Although the majority opinion is well researched, it presents a dramatic departure from the parties' briefs in this case, which do not address—either directly or tangentially by citation to applicable case law from other jurisdictions—the applicability of the *Watson* v. *Button*/American Law Institute principles that form the basis of the majority decision. Indeed, the plaintiff, whose brief obliquely appears to seek an exception from the general rule of *Channing Real Estate, LLC* v. *Gates*,

Saunders *v.* Briner

Second, I find more persuasive the analysis of those courts that have rejected the *Watson* v. *Button*/American Law Institute approach to close corporation standing. The leading decision on this point is *Bagdon* v. *Bridgestone/Firestone, Inc.*, 916 F.2d 379 (7th Cir. 1990), cert. denied, 500 U.S. 952, 111 S. Ct. 2257, 114 L. Ed. 2d 710 (1991), in which the United States Court of Appeals for the Seventh Circuit rejected, as a matter of Delaware law, the expansion of the "special injury" doctrine articulated in *Watson* v. *Button*, supra, 235 F.2d 237, "into a general exception for closely held corporations, treating them as if they were partnerships." *Bagdon* v. *Bridgestone/Firestone, Inc.*, supra, 383–84. The Seventh Circuit emphasized that the "premise of this extension may be questioned. Corporations are *not* partnerships. Whether to incorporate entails a choice of many formalities. Commercial rules should be predictable; this objective is best served by treating corporations as what they are, allowing the investors and other participants to vary the rules by contract if they think deviations are warranted. So it is understandable that not all states have joined the parade." (Emphasis in original.) Id., 384; see also *Frank* v. *Hadesman & Frank, Inc.*, 83 F.3d 158, 162 (7th Cir. 1996) (declining to adopt American Law Institute's § 7.01 [d] as matter of Illinois law).

supra, 326 Conn. 123, based on his provision to Saunders Capital of his personal funds that became the LR Global bridge loan, does not acknowledge the line of Appellate Court cases; see, e.g., *Padawer* v. *Yur*, supra, 142 Conn. App. 812; relied on by the defendants, that directly forecloses his standing in this case as the sole member of the LLC. See footnote 4 of this dissenting opinion. Although we have somewhat more latitude to act independently of the parties' briefs in this area in light of its implications on subject matter jurisdiction; see, e.g., *State* v. *Dort*, 315 Conn. 151, 161, 106 A.3d 277 (2014); *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 148–49, 84 A.3d 840 (2014); I would not do so without supplemental briefing from the parties and the issuance of appropriate amicus curiae invitations, given the significant effect of the majority opinion on Connecticut's body of corporate law, particularly as it relates to our state's many close corporations and small LLCs.

Saunders *v.* Briner

Similarly, the Virginia Supreme Court "decline[d] to adopt a closely held corporation exception to the rule requiring that suits for breach of fiduciary duty against officers and directors must be brought derivatively on behalf of the corporation and not as individual shareholder claims. Adherence to the general rule without this proposed exception prevents multiplicity of lawsuits by shareholders. A recovery by the corporation protects all shareholders as well as creditors. Finally, as expressed in *Bagdon* [v. *Bridgestone/Firestone, Inc.*, supra, 916 F.2d 384], consistent application of commercial rules promotes predictability. If shareholders and the corporation desire to vary commercial rules by contract, they are free to do so." *Simmons* v. *Miller*, 261 Va. 561, 576, 544 S.E.2d 666 (2001). Indeed, the Virginia Supreme Court has extended this analysis from *Simmons* to the LLC context. See *Remora Investments, LLC* v. *Orr*, 277 Va. 316, 323–24, 673 S.E.2d 845 (2009) (intracompany dispute between manager and member of LLC).

Beyond undermining the advantages of predictability and stability, the majority's approach also relieves the plaintiff of the consequences of his business decision to proceed through his LLC, thereby giving him "the best of both business entities: limited liability provided by a corporate structure and direct compensation for corporate losses. That cushy position is not one the law affords. Investors who created the corporate form cannot rend the veil they wove. . . . Recovery by the corporation ensures that all of the corporate participants—stockholders, trade creditors, employees and others will recover according to their contractual and statutory obligations. . . . We have consistently held that a corporation is an entity separate and distinct from its shareholders. " (Citations omitted; internal quotation marks omitted.) *Landstrom* v. *Shaver*, 561 N.W.2d 1, 14 (S.D. 1997); see also *Wessin* v. *Archives Corp.*, 592

Saunders *v.* Briner

N.W.2d 460, 466 (Minn. 1999) (rejecting American Law Institute's approach to abandon the "direct-derivative distinction for closely held corporations" because, although ''closely held corporations have been described as partnership[s] in corporate guise . . . a closely held corporation is still a corporation *with all of the rights and limitations proscribed by the legislature*,'' and "[a] uniform, fair and predictable mechanism for enforcing claims of the corporation is important for the corporation and all of the shareholders" [citations omitted; emphasis added; internal quotation marks omitted]); *Keller* v. *Estate of McRedmond*, 495 S.W.3d 852, 881–82 (Tenn. 2016) (rejecting argument seeking "an exception to the general rule prohibiting a shareholder from asserting a claim belonging to the corporation based on the fact that this is a subchapter S, [closely held] corporation," rendering parties "more like partners in a partnership who are harmed individually when the corporation is harmed," because, "where parties have deliberately chosen to do business in corporate form for other reasons such as tax or accounting purposes, they cannot disregard the corporate form at their convenience" [citations omitted; internal quotation marks omitted]).

Moreover, as the Appellate Court observed in *Padawer* v. *Yur*, supra, 142 Conn. App. 817–18, the majority's approach to standing is directly inconsistent with General Statutes (Rev. to 2017) § 34-134, which provides that "[a] member or manager of a limited liability company is not a proper party to a proceedings by or against a limited liability company solely by reason of being a member or manager of the limited liability company, except where the object of the proceeding is to enforce a member's or manager's right against or liability to the limited liability company or as otherwise provided in an operating agreement." Consistent with the statutory analysis in *Padawer*, the Nebraska Supreme Court has observed that the approach to stand-

Saunders *v.* Briner

ing endorsed by the majority would "allow a member of an LLC to use the corporate form as a shield to protect itself from personal liability for acts taken by an LLC while still allowing an individual to collect damages, such as lost profits, incurred by the LLC." *Freedom Financial Group, Inc.* v. *Woolley*, supra, 280 Neb. 834; see id. (The court rejected the argument of the plaintiff, the sole member of the LLC, that it had standing to bring a professional negligence action against the LLC's attorneys because, "[a]s a member of an LLC, [the plaintiff] is not a proper party to this suit, because [the defendant's] alleged liability is to [the LLC] and any potential damages would also belong to [the LLC]. [The plaintiff] may not attempt to use the corporate form of the LLC to shield itself from liability and then use the same corporate form as a sword to recover damages or enforce liability to the LLC.").

Similarly, in concluding that the sole member of a trucking business structured as an LLC lacked standing to bring an action for lost profits, the Kentucky Supreme Court rejected the argument that, "because [the defendant] was the sole owner of the business he was necessarily the real party in interest, a status that allowed him to properly advance the lost profits claim in his own name rather than in the name of the LLC." *Turner* v. *Andrew*, supra, 413 S.W.3d 276. The court emphasized that the "LLC and its solitary member . . . are not legally interchangeable. Moreover, an LLC is not a legal coat that one slips on to protect the owner from liability but then discards or ignores altogether when it is time to pursue a damage claim. The law pertaining to [LLCs] simply does not work that way."[10] Id.; see *Krueger* v.

_____

[10] I disagree with the majority's reliance on corporate veil piercing principles in support of "[a]llowing investors to disregard the corporate form in order to recover for corporate losses owed to them individually . . . ." In rejecting a similar argument that, "because [the defendant] is the sole owner of the LLC and the business operated from his residence the LLC can be disregarded," the Kentucky Supreme Court observed that, "[w]hile it is true that there are limited instances where an LLC's separate entity status may

Saunders *v.* Briner

*Zeman Construction Co.*, supra, 758 N.W.2d 889–90 (The court concluded that an LLC member lacked standing to bring a claim under a business practice discrimination statute because it was the LLC, "and not [the] appellant personally, [that] entered into a contract with [the] respondent. . . . Because a member of [an LLC] is protected from personal liability for the company's acts, debts, liability, and obligations, unless the corporate veil is pierced, [the] appellant gained protection from the decision. . . . Indeed, the avoidance of personal liability is a legitimate reason for forming [an LLC]. . . . But [the] appellant also gave up some rights." [Citations omitted.]); *Woods View II*, *LLC* v. *Kitsap*, supra, 188 Wn. App. 23–24 (Even though the sole shareholder personally guaranteed loans, she lacked standing to seek a remedy for "consequential damages that would not have happened but for the primary harm to [the plaintiff LLC]. A shareholder does not have standing to recover consequential damages that result

be disregarded in the interest of equity, this is not one of those cases." *Turner* v. *Andrew*, supra, 413 S.W.3d 276. As the Kentucky court observed, "[p]iercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation. . . . The doctrine can also apply to [LLCs]." (Citation omitted; internal quotation marks omitted.) Id., 276–77; see, e.g., *McKay* v. *Longman*, 332 Conn. 394, 432–33, 211 A.3d 20 (2019) (describing equitable nature and purpose of corporate veil piercing under Connecticut law). As the Kentucky court notes, the majority's approach in essence calls for "insider reverse [veil] piercing," which would be "employed in that rare instance where equity is perceived to require disregard of the entity. Thus, the estate of a sole corporate shareholder/LLC member may be allowed to recover as an 'insured' under a policy issued to the entity . . . or a sole shareholder or LLC member may be allowed to claim the protection of a usury statute even though the loan was to the entity . . . . In all of the limited number of insider reverse [veil] piercing cases, strong public policy considerations have been at the heart of the court's decision." (Citations omitted.) *Turner* v. *Andrew*, supra, 277. I believe that there are no significant public policy reasons to disregard the corporate form in this case, which simply presents a matter of the wrong plaintiff bringing the claims at issue. See id. ("[The defendant] created an LLC and it appears that it was conducting the trucking business at issue. By law, the only appropriate plaintiff to assert the lost business damages claim was the LLC . . . .").

Saunders *v.* Briner

from the harm to her corporation. . . . The fact that [she] was the sole shareholder of [the plaintiff] does not change our analysis: a sole shareholder, by necessity, cannot show an injury distinct from that to other shareholders.'' [Citation omitted; internal quotation marks omitted.]).

Particularly because LLCs are entirely creatures of statute; see, e.g., *Styslinger* v. *Brewster Park, LLC*, supra, 321 Conn. 317; I believe that action in this area that affects a party's rights and remedies is a uniquely legislative function. Because the legislature is active in this area, given its recent passage of the comprehensive Connecticut Uniform Limited Liability Company Act, and because there are natural constituencies that are well situated to advocate for legislative action in this area, I believe it best to stay our hand rather than make a public policy judgment expanding standing in civil cases involving LLCs. See *Krueger* v. *Zeman Construction Co.*, supra, 758 N.W.2d 890 (deferring to legislature to create remedy for business practice discrimination when party is single member LLC); compare *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 550–51 n.35, 93 A.3d 1142 (2014) (declining to overrule Freedom of Information Act case law because ''[t]he circumstances of the enactment of [a statutory provision governing law enforcement disclosure obligations], and the controversy that continues to this day about the relationship between criminal investigations and the public's right to know under the act, demonstrates that this is the kind of issue that is squarely on the radar of the legislature and the various interested entities''), with *State* v. *Salamon*, 287 Conn. 509, 523–24, 949 A.2d 1092 (2008) (In overruling a prior interpretation of the kidnapping statute, this court reasoned that ''the issue presented by the defendant's claim is not one that is likely to have reached the top of the legislative agenda because the issue directly implicates only a relatively narrow category of criminal

cases, that is, kidnapping cases in which the restraint involved is incidental to the commission of another crime. Moreover, in contrast to other matters that are subject to legislative regulation, it is uncertain whether the position that the defendant advocates would attract interested sponsors with access to the legislature."). Accordingly, I respectfully disagree with the majority's conclusion in part I B of its opinion that the plaintiff had standing with respect to counts four, six, nine and ten of the second amended complaint.

Because I would reverse the judgment of the trial court in its entirety, I respectfully concur in part and dissent in part.

———————————